# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **MARK GOLDSTEIN AND LESTER LARKAI** | * | |
| | * | **CASE NO:** |
| **VERSUS** | * | |
| | * | **JURY TRIAL DEMANDED** |
| **MARK WOOD, IN HIS INDIVIDUAL AND** | * | |
| **OFFICAL CAPACITY AS SHERIFF OF** | * | |
| **RAPIDES PARISH; JUSTIN JOHNSON;** | * | |
| **RAPIDES PARISH POLICE JURY;** | * | |
| **NORTEC, LLC; NURSE JANE DOE;** | * | |
| **LT. SHANNON; DEPUTY JOHN DOE 1;** | * | |
| **DEPUTY JOHN DOE 2; DEPUTY JANE DOE** | * | |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## PETITION FOR DAMAGES

NOW INTO COURT, through undersigned counsel, come Plaintiffs, Mark Goldstein and Lester Larkai, who respectfully file this Petition for Damages and allege the following:

## PARTIES

1.

Made Plaintiffs herein are the following:

a) **MARK GOLDSTEIN**, a person of the full age of majority who is domiciled in Grand View, New York; and

b) **LESTER LARKAI**, a person of the full age of majority who is domiciled in Yonkers, New York.

2.

Made Defendants herein are the following:

a) **MARK WOOD**, a person of full age of majority, domiciled in Rapides Parish, State of Louisiana, and who was at all times relevant to this Complaint the duly elected Sheriff of Rapides Parish, and had authority over and was responsible for the hiring, training, supervision, discipline, and control of the Rapides Parish Sheriff's Office deputies and employees, including Deputy Justin Johnson, Lt. Shannon, Deputy John Doe 1, Deputy John Doe 2, and Deputy Jane Doe. Sheriff Mark Wood also had authority over and was responsible for the Rapides Parish

1

Sheriff's Office policies, procedures, customs, practices, and operations. Sheriff Mark Wood also had authority over and was responsible for the policies, practices, customs, and operations of the Rapides Parish Detention Center (Centers 1, 2, and 3), including those dealing with the treatment of inmates and detainees and the administration of medical care to inmates and detainees of the Rapides Parish Detention Centers under his control. Sheriff Mark Wood also had authority over and was responsible for the hiring, training, supervision, discipline, and control of the Rapides Parish Detention Center (Centers 1, 2, and 3) employees and corrections officers. At all times relevant to this Complaint, Sheriff Mark Wood was acting under color of law and in the course and scope of his employment. Sheriff Mark Wood is being sued in both his official capacity and individual capacity.

b)  **JUSTIN JOHNSON**, a person of full age of majority, domiciled in Rapides Parish, State of Louisiana, and who was at all times relevant to this Complaint a deputy for the Rapides Parish Sheriff's Office who was working in the course and scope of his employment for the Rapides Parish Sheriff's Office. Deputy Justin Johnson is being sued in his individual capacity.

c)  **RAPIDES PARISH POLICE JURY**, a political entity capable of suing and being sued. The Rapides Parish Police Jury is the entity responsible for funding operations of the Rapides Parish Detention Center (Centers 1, 2, and 3). The Rapides Parish Police Jury negotiates, approves, and funds all operations of the Rapides Parish Detention Center (Centers 1, 2, and 3). The Rapides Parish Police Jury is the governing authority for the Parish which operates under the police jury system as provided by the general laws of the state. The Police Jury is both a legislative and administrative body. Its legislative functions include enacting ordinance and resolutions, establishing programs and setting policy. As an administrative body, it prepares the budget, hires personnel, spends money, negotiates contracts and in general, directs the activities under its supervision.

d)  **NOTREC, LLC**, a private medical and mental health care provider under contract with the Rapides Parish Sheriff's Office and/or the Rapides Parish Police Jury to provide medical and mental health treatment and care to detainees and inmates at the Rapides Parish Detention Center (Centers 1, 2, and 3), and was responsible for providing all staffing, training, supervision, policies, and procedures for all medical care and mental health personnel at the Rapides Parish Detention Center (Centers 1, 2, and 3). Nortec, LLC is a separate entity from both the Rapides Parish Sheriff's Office and the Rapides Parish Police Jury that is also capable of being sued for its role in the provision of medical care to detainees and inmates at the Rapides Parish Detention Center (Centers 1, 2, and 3). Nortec, LLC, as a private contractor engaged by a governmental entity to provide health to detainees and inmates at the Rapides Parish Detention Center (Centers 1, 2, and 3), is treated as a state actor under § 1983.

e)  **NURSE JANE DOE**, a person of full age of majority, domiciled in Rapides Parish,

State of Louisiana, and who was at all times relevant to this Complaint a nurse at the Rapides Parish Detention Center (Center 1) who was employed by Nortec, LLC to provide medical care and treatment to inmates and pre-trial detainees, including Plaintiff Mark Goldstein, at the Rapides Parish Detention Center (Center 1).

f) **LT. SHANNON**, a person of full age of majority, domiciled in Rapides Parish, State of Louisiana, and who was at all times relevant to this Complaint a lieutenant for the Rapides Parish Sheriff's Office who was working in the course and scope of his employment for the Rapides Parish Sheriff's Office. At this time, Plaintiffs do not know Lt. Shannon's first name. Lt. Shannon is being sued in his individual capacity.

g) **DEPUTY JOHN DOE 1**, a person of full age of majority, domiciled in Rapides Parish, State of Louisiana, and who was at all times relevant to this Complaint a deputy for the Rapides Parish Sheriff's Office who was working in the course and scope of his employment for the Rapides Parish Sheriff's Office. Plaintiffs do not know the true identity of Deputy John Doe 1 at this time. Deputy John Doe 1 is being sued in his individual capacity.

h) **DEPUTY JOHN DOE 2**, a person of full age of majority, domiciled in Rapides Parish, State of Louisiana, and who was at all times relevant to this Complaint a deputy for the Rapides Parish Sheriff's Office who was working in the course and scope of his employment for the Rapides Parish Sheriff's Office. Plaintiffs do not know the true identity of Deputy John Doe 2 at this time. Deputy John Doe 2 is being sued in his individual capacity.

i) **DEPUTY JANE DOE**, a person of full age of majority, domiciled in Rapides Parish, State of Louisiana, and who was at all times relevant to this Complaint a deputy for the Rapides Parish Sheriff's Office who was working in the course and scope of her employment for the Rapides Parish Sheriff's Office. Plaintiffs do not know the true identity of Deputy Jane Doe at this time. Deputy Jane Doe is being sued in her individual capacity.

3.

At all times relevant to this Complaint, all Defendants are alleged to be jointly, severally, and/or *in solido* liable to and responsible for the harms caused to Plaintiffs Mark Goldstein and Lester Larkai.

**JURISDICTION AND VENUE**

4.

The United States District Court has jurisdiction over the subject matter of this complaint under 42 U.S.C. 1983 and 28 U.S.C. 1331, 1343(a)(3), and 1367(a).

5.

The Western District of Louisiana is the appropriate venue to bring this complaint, because the facts that give rise to Plaintiffs' claims all took place within the Western District of Louisiana.

**FACTUAL ALLEGATIONS SURROUNDING JULY 7, 2022**

6.

On July 3, 2022, Plaintiff Mark Goldstein ("Goldstein") rented a 15-foot Chevrolet U-Haul moving van in Reno, NV for the purpose of moving furniture and appliances taken from Goldstein's recently sold vacation home in Lake Tahoe, CA to Goldstein's newly purchased vacation home in Palm Beach, FL. Goldstein also planned to make a stop and drop off some of the furniture at a hotel that Goldstein owns and developed in Orange Beach, AL

7.

According to the July 3, 2022 "U-Haul Equipment Contract," Goldstein rented a 15-foot U-Haul moving van bearing Arizona license plate number AH28152. The contract indicated that the pick-up/renting location was U-Haul at Oddie Blvd. in Reno, NV, and the drop off location was 806 Conniston Rd., West Palm Beach, FL. The contract further indicated that Goldstein paid for the U-Haul rental using a credit card.

8.

Goldstein resorted to renting a U-Haul moving van and making the move himself because he was unable, at the time, to obtain the services of a moving company to make the move.

9.

To help out with Goldstein's cross-country drive and move, Goldstein personally hired and paid Plaintiff Lester Larkai ("Larkai") to travel with him, to take turns driving, and to help with moving the furniture and appliances. In doing so, Goldstein paid to fly Larkai from New York to Reno, NV.

10.

Goldstein was well acquainted with Larkai because Larkai was/is an employee of Goldstein's Amazon delivery business.

11.

On the morning of July 7, 2022, Goldstein and Larkai were traveling in the properly leased Chevrolet U-Haul moving van heading southbound on Interstate-49 in Alexandria, LA. At that time, Larkai was the driver and Goldstein was asleep in the passenger seat because Goldstein had previously been driving all night.

12.

At approximately 8:00 a.m. [on July 7, 2022], while driving southbound on Interstate-49 in Alexandria, LA, Larkai drove past a fully marked Rapides Parish Sheriff's vehicle that was parked on the side of the interstate at mile marker 99.

13.

After driving pass the Rapides Parish Sheriff's vehicle, Larkai watched in his side-view mirrors to see if the Sheriff's vehicle would stay put or pull out on to the Interstate and start pursuing him/the U-Haul moving van.

15.

During the entire time that Larkai was able to visualize the Sheriff's vehicle in his side-view mirrors [after passing the Sheriff's vehicle], Larkai saw that the Sheriff's vehicle never moved, so Larkai continued driving on.

16.

After passing the Sheriff's vehicle and driving for a number of miles, Larkai noticed in his left side-view mirror that the Sheriff's vehicle was following behind him with its red/blue lights on, but no audible sirens.

17.

Seeing that a Sheriff vehicle with its red/blue emergency lights on was driving directly behind him, Larkai immediately pulled over on the side of Interstate-49 and brought the U-Haul moving van to a stop near mile marker 86. Larkai then woke up Goldstein to tell him that they were being pulled over.

18.

The Rapides Parish Sheriff's vehicle, which was being driven by Rapides Parish Sheriff's Deputy Justin Johnson ("Deputy Johnson"), then pulled over behind the U-Haul moving van. Deputy Johnson's narrative report stated that he decided to stop the U-Haul moving van because he observed [while stopped on the side of Interstate-49 at mile marker 99] the U-Haul approach his location while driving in the left lane, and then passed his location while driving over the centerline of the interstate.

19.

Deputy Johnson is a Rapides Parish Sheriff deputy who is part of the Rapides Area Drug Enforcement ("RADE") Unit which targets individuals suspected of trafficking narcotics in the

Central Louisiana area. The other Rapides Parish Sheriff deputies that Deputy Johnson was calling to join him for the stop of the U-Haul were also part of the RADE Unit.

20.

Upon information and belief, after Deputy Johnson saw Larkai drive past him in the U-Haul on Interstate-49 near mile marker 99 and later began pursuing the U-Haul, Deputy Johnson didn't immediately activate his sheriff vehicle's emergency red/blue lights [which would have indicated to Larkai that the sheriff vehicle was attempting to pull him over] because Deputy Johnson was calling out mile markers over the radio to other Rapides Parish Sheriff deputies to join him for the stop, and once the other Rapides Parish Sheriff deputies were in place to be able to quickly join Deputy Johnson at the stop, Deputy Johnson decided to activate his emergency red/blue lights to make the stop on the U-Haul.

21.

Once Larkai pulled the U-Haul moving van over on the side of the interstate, Deputy Johnson stayed in his vehicle, used his vehicle door as a shield, drew and pointed his service weapon (gun) at Larkai, and demanded/yelled at Larkai to exit the U-Haul and walk towards him.

22.

Larkai then exited the driver's side of the U-Haul moving van and walked towards Deputy Johnson near the rear of the U-Haul. At that time, Deputy Johnson immediately handcuffed Larkai. Larkai was not read his Miranda rights at the time he was handcuffed.

23.

Deputy Johnson then asked Larkai why he didn't pull over [sooner], and Larkai explained that he never saw Deputy Johnson's vehicle behind him, but that once he saw Deputy Johnson's vehicle with its emergency lights on, Larkai immediately pulled over.

24.

Deputy Johnson advised Larkai that he had been trying to pull Larkai over for several miles, and that Larkai's failure to pull over [sooner] is considered "flight."

25.

Larkai again explained that he could not and did not see Deputy Johnson's vehicle behind him [until the moments right before Larkai pulled over] due to the U-Haul moving van being so big and having a blind spot. Larkai also told Deputy Johnson that he saw Deputy Johnson's Sheriff's vehicle parked on the side of the interstate at mile marker 99; that he was going the speed limit at the time he passed Deputy Johnson's vehicle; and that he never saw Deputy Johnson's vehicle pull out onto the interstate behind him. Deputy Johnson told Larkai that he was correct, and that he [Deputy Johnson] did not initially pull out and begin pursuing the U-Haul moving van after it passed Deputy Johnson's parked vehicle.

26.

Deputy Johnson then went around to the passenger side of the U-Haul moving van, pulled Goldstein from the vehicle, and handcuffed Goldstein. Goldstein was not read his Miranda rights at the time he was handcuffed.

27.

Goldstein then asked Deputy Johnson why he was being arrested, and Deputy Johnson said because he [Goldstein] was a passenger in a fleeing vehicle, to which Goldstein asked, "fleeing from what."

28.

Goldstein then asked Deputy Johnson what's going on and why was Larkai was being arrested. Deputy Johnson told Goldstein that he had been trying to pull the U-Haul moving van over for several miles and that Larkai's failure to pull over is considered "flight."

29.

A few minutes after Deputy Johnson's stop of the U-Haul, and once Larkai and Goldstein were handcuffed standing near the rear of the U-Haul, an additional four (4) Rapides Parish Sheriff RADE deputies arrived on scene.

30.

The four (4) Rapides Parish Sheriff RADE deputies that arrived on scene were Lt. Shannon, Deputy Jane Doe, Deputy John Doe 1, and Deputy John Doe 2.

31.

Once Lt. Shannon, Deputy Jane Doe, Deputy John Doe 1, and Deputy John Doe 2 arrived on scene, Deputy Johnson asked Larkai and Goldstein for their ID's (driver's license) and cell phones.

32.

Goldstein told Deputy Johnson that his ID was on the back of his cell phone inside the front cab (*i.e.*, driver and passenger area) of the U-Haul moving van.

33.

Larkai told Deputy Johnson that his ID was in a black bag inside the front cab area of the U-Haul moving van.

34.

Deputy Johnson then entered the cab of the U-Haul moving van and proceeded to search through Goldstein's briefcase and pulled out Goldstein's wallet.

35.

Goldstein then told Deputy Johnson that his ID was not in his wallet or briefcase, and that his ID was in the card holder on the back of Goldstein's cell phone, which was in the cab of the U-Haul moving van.

36.

Deputy Johnson retrieved Goldstein's cell phone from the cab of the U-Haul moving van.

37.

Deputy Johnson also retrieved Larkai's wallet from the black bag inside the front cab area of the U-Haul moving van.

38.

Deputy Johnson also retrieved and reviewed the July 3, 2022 "U-Haul Equipment Contract" which showed that the U-Haul was properly rented/leased to Goldstein; showed that the U-Haul pick-up/renting location was Reno, NV and the drop off location was West Palm Beach, FL; and showed that Goldstein paid for the U-Haul rental using a credit card.

39.

However, at no point did Goldstein or Larkai ever give Deputy Johnson consent to search through the cab of the U-Haul moving van or their personal belongings.

40.

Upon information and belief, while Deputy Johnson was searching through the black bag for Larkai's wallet, Deputy Johnson saw that the black bag contained a clear zip-lock bag containing white oval pills stamped with "ES" on them.

41.

Deputy Johnson asked Goldstein and Larkai where they were coming from, where they were going, and what was in the U-Haul moving van.

42.

Goldstein advised Deputy Johnson that they were coming from Reno, NV and going to Goldstein's hotel in Orange Beach, AL and then to Palm Beach, FL. Goldstein also advised Deputy Johnson that Larkai is a driver for Goldstein and that Larkai was helping him move furniture.

43.

Deputy Johnson then asked Goldstein and Larkai if there was anything illegal inside the U-Haul moving van, such as handguns, rocket launchers, grenades, dead bodies, or illegal narcotics, and both Goldstein and Larkai responded "no."

44.

Deputy Johnson then asked Goldstein where the key was to unlock the padlock and open the back (enclosed cargo area) of the U-Haul. Goldstein said that the key was on the U-Haul key keychain, but Goldstein did not give Deputy Johnson consent to enter the cab of the U-Haul and obtain the key.

45.

Nevertheless, Deputy Johnson proceeded to enter the cab of the U-Haul, grabbed the padlock key, unlocked the padlock, opened the back of the U-Haul to see if it did in fact have furniture in it.

46.

Around this time, Deputy Johnson and/or Deputy Jane Doe then proceeded to place Larkai (while handcuffed) in the back of a Rapides Sheriff vehicle. Larkai was not read his Miranda rights at the time he was placed in the back of the Rapides Sheriff vehicle.

47.

At no point did Deputy Johnson or Lt. Shannon, Deputy Jane Doe, Deputy John Doe 1, and Deputy John Doe 2 express that they smelled the odor of alcohol or drugs coming from the U-Haul moving van, or coming from Goldstein's and/or Larkai's person. Nor did Deputy Johnson or Lt. Shannon, Deputy Jane Doe, Deputy John Doe 1, and Deputy John Doe 2 express that they believed Goldstein and/or Larkai were acting strange or nervous.

48.

Nevertheless, Deputy Johnson retrieved his K-9 (Sheriff's deputy drug dog) and brought the dog to the front of the U-Haul moving van to begin sniffing the front driver/passenger cab area of the U-Haul.

49.

According to Deputy Johnson, the K-9 had a "hit" for an unknown drug odor in the front driver/passenger cab area of the U-Haul moving van.

50.

Neither Goldstein nor Larkai saw the K-9 make any moves which would indicate a "hit."

51.

Deputy Johnson then questioned Goldstein about what was in the U-Haul, and Goldstein told him again that they were moving furniture.

52.

Deputy Johnson then searched through the front cab of the U-Haul moving van (again), including a search of Larkai's black bag containing his wallet that Deputy Johnson previously searched through, and grabbed the clear zip-lock bag containing white oval pills stamped with "ES" on them that he previously saw when he grabbed Larkai's wallet.

53.

Upon information and belief, Deputy Johnson deployed the K-9 to perform a sniff of the front cab area of the U-Haul only *after* Deputy Johnson had illegally searched [without any consent] the front cab area of the U-Haul for Goldstein's and Larkai's drivers' licenses and saw the clear zip-lock bag containing white oval pills stamped with "ES."

54.

According to Deputy Johnson's narrative report, Deputy Johnson believed that the white oval pills stamped with "ES" were an illegal Schedule III narcotic, namely, Vicodin.

55.

However, the white oval pills stamped with "ES" were not any illegal narcotics, but rather were Excedrin Extra Strength pills, hence the "ES" stamped on the pills. In fact, the white oval pills stamped with "ES" were later tested by Rapides Parish Sheriff deputies at the Rapides Parish Sheriff RADE office and the results showed and confirmed that the pills were not Vicodin or any other illegal narcotic.

56.

While Deputy Johnson claimed that the K-9 had a "hit" for an unknown drug odor in the front driver/passenger cab area of the U-Haul, no illegal drugs or contraband were found in the front cab. As stated above, the white oval pills stamped with "ES" were Excedrin Extra Strength pills, not Vicodin or any other illegal narcotic.

57.

The alleged "hit" for an unknown drug odor in the front driver/passenger cab area of the U-Haul by Deputy Johnson's K-9 was false and only served as a false pretext to continue the illegal

search the U-Haul and Goldstein's/Larkai's personal belongings without a warrant and without consent.

58.

Deputy Johnson along with Deputy Jane Doe and Deputy John Doe 1, at the direction of Deputy Johnson, proceeded to illegally search through the cargo area of the U-Haul as well as Goldstein's and Larkai's suitcases.

59.

At no point did Goldstein or Larkai give Deputy Johnson, Deputy Jane Doe, or Deputy John Doe 1 consent to search any part of the U-Haul moving van or their personal belongings. In fact, during the entire time that the give Deputy Johnson, Deputy Jane Doe, and Deputy John Doe 1illegally searched the U-Haul, Larkai was being detained in a Sheriff's deputy vehicle against his will, in pain due to his handcuffs being overly tight, without freedom of movement, and without the ability to object to and/or stop the illegal search of the U-Haul and his belongings.

60.

In searching through Goldstein's suitcase located in the cargo area of the U-Haul, Deputy Johnson found a small container with three (3) CBD/THC gummies.

61.

Lt. Shannon and Deputy John Doe 2 were present for and saw that Deputy Johnson, Deputy Jane Doe, and Deputy John Doe 1 were conducting an illegal search of Goldstein's/Larkai's U-Haul and personal belongings, in violation of Goldstein's and Larkai's Fourth Amendment rights, but Lt. Shannon and Deputy John Doe 2 never intervened to stop Deputy Johnson, Deputy Jane Doe, and Deputy John Doe 1 from conducting the illegal search, and therefore acquiesced in the violation of Goldstein's and Larkai's constitutional rights.

62.

Deputy Johnson asked Goldstein if the gummies were his, to which Goldstein responded yes. Goldstein then explained that he takes them for his arthritis and muscle recovery, that the gummies are legal where he lives and that he has a medical card for—although he did not have his medical card with him at the time.

63.

Deputy Johnson then told Goldstein "gotcha," and Lt. Shannon proceeded to place Goldstein, who was already handcuffed, in the back of Lt. Shannon's Rapides Sheriff vehicle.

64.

Goldstein was arrested on one count of possession of CDS 1st offense 14 grams or less of marijuana, tetrahydrocannabinol or chemical derivatives thereof in violation of La. R.S. 40:966(C)(2)(A).

65.

Larkai was arrested on one count of improper driving on left in violation of La. R.S. 32:71, one count of flight from an officer in violation of La. R.S. 14:108.1, and one count of possession of a Schedule III controlled dangerous substance in violation of La. R.S. 40:968(C).

66.

Goldstein and Larkai were then transported in separate Rapides Sheriff deputy vehicles to the Rapides Parish Sheriff's RADE (Rapides Area Drug Enforcement) office for additional interrogation and questioning. Goldstein was transported to the Rapides Parish Sheriff's RADE office by Lt. Shannon. Larkai was transported to the Rapides Parish Sheriff's RADE office by Deputy Jane Doe.

67.

The Rapides Parish Sheriff's office and/or Deputy Johnson also took possession of and arranged for the U-Haul moving van to be towed to the Rapides Parish Sheriff's RADE office so that Rapides Parish Sheriff deputies could perform an additional and comprehensive search of the U-Haul for any other illegal narcotics.

68.

Goldstein and Larkai arrived at the Rapides Parish Sheriff's RADE office at around 9:00 a.m. on July 7, 2022.

69.

Upon arriving at the Rapides Parish Sheriff's RADE office, Deputy Johnson asked Larkai if he had read him his Miranda rights, and Larkai responded "no." Deputy Johnson then proceeded to read Larkai his Miranda rights at the Rapides Parish Sheriff's RADE office.

70.

Goldstein and Larkai were then each placed in separate rooms at the Rapides Parish Sheriff's RADE office for additional interrogation and questioning by various other Rapides Parish Sheriff deputies, one of which included Lt. Shannon.

71.

While at the Rapides Parish Sheriff's RADE office, Larkai was questioned by at least three (3) different Rapides Parish Sheriff deputies about his relation to Goldstein and about he and Goldstein's travels. Larkai explained that he works for Goldstein and that he was helping Goldstein move some furniture across the country. Larkai explained that their travels started in Reno, NV and that Goldstein paid for Larkai to fly to Reno, NV to meet Goldstein and start the cross-country move.

72.

While at the Rapides Parish Sheriff's RADE office, Larkai was also questioned about the white oval pills stamped with "ES," which the Rapides Parish Sheriff deputies believed to be Vicodin, and was asked whether he had a prescription for the "Vicodin pills in [his] bag." Larkai then explained that the white pills found in his bag in the U-Haul were Excedrin Extra Strength pills that he takes because he suffers from regular migraine headaches. In fact, the pills were tested at the Rapides Parish Sheriff's RADE office crime lab and the test results showed and confirmed that the pills were not Vicodin or any other illegal Schedule III narcotic.

73.

Even though the crime lab test results showed and confirmed that the pills were not Vicodin or any other illegal Schedule III narcotic, Larkai was nevertheless still charged with possession of a Schedule III controlled dangerous substance in violation of La. R.S. 40:968(C).

74.

While at the Rapides Parish Sheriff's RADE office, Goldstein was questioned by Lt. Shannon about where he and Larkai were coming from, where they were going, the purpose of their trip, etc. Goldstein gave the same answers that he gave when he was questioned by Deputy Johnson during the stop on the side of Interstate-49.

75.

At all times relevant hereto, Goldstein's story and Larkai's story about their travels matched up. Their travel itinerary (*i.e.*, traveling from Reno, NV to West Palm Beach, FL) was also evident from the July 3, 2022 "U-Haul Equipment Contract," which Deputy Johnson retrieved and reviewed during the stop on Interstate-49.

76.

However, the Rapides Parish Sheriff deputies questioning Goldstein and Larkai at the RADE office still did not believe Goldstein's or Larkai's stories. In fact, one of the Rapides Parish Sheriff deputies that was questioning Larkai at the RADE office told Larkai that he believed Goldstein was "dirty," that Goldstein was not who he said he was, that Goldstein was using Larkai to transport drugs across state lines, and that Goldstein was the drug "kingpin" and Larkai was the "mule." Another Rapides Parish Sheriff deputy at the RADE office told Larkai that he believed something "fishy" was going on and it may not be drugs, but its "fishy," and went on to claim that Goldstein and Larkai were transporting stolen furniture.

77.

Goldstein and Larkai was interrogated and questioned for approximately 2.5 hours at the Rapides Parish Sheriff's RADE office.

78.

During the time that Goldstein and Larkai were being interrogated and questioned at the Rapides Parish Sheriff's RADE office, Deputy Johnson, Lt. Shannon, and other Rapides Parish Sheriff deputies were also conducting an additional extensive search of the U-Haul (which had been towed to the RADE office) for any other illegal narcotics and contraband.

79.

However, after an extensive search of the U-Haul at the Rapides Parish Sheriff's RADE office, no other illegal narcotics or contraband were found.

80.

After hours of additional interrogation and questioning and an extensive search of the U-Haul at the Rapides Parish Sheriff's RADE office, Goldstein and Larkai were both transported to the Rapides Parish Detention Center (Center 1) for booking.

Goldstein was booked into the Rapides Parish Detention Center (Center 1) at 2:49 p.m. on one count of possession of CDS 1st offense 14 grams or less of marijuana, tetrahydrocannabinol or chemical derivatives thereof in violation of La. R.S. 40:966(C)(2)(A). Larkai was booked into the Rapides Parish Detention Center (Center 1) at 2:06 p.m. on one count of improper driving on left in violation of La. R.S. 32:71, one count of flight from an officer in violation of La. R.S. 14:108.1, and one count of possession of a Schedule III controlled dangerous substance in violation of La. R.S. 40:968(C).

82.

Of note, all of the criminal charges brought against Goldstein and Larkai as a result of their July 7, 2022 encounter with the Rapides Parish Sheriff's Office deputies were dismissed by the District Attorney for the Ninth Judicial District for Rapides Parish on August 9, 2022.

83.

The conduct of Deputy Johnson, Lt. Shannon, Deputy Jane Doe, Deputy John Doe 1, and Deputy John Doe 2, as alleged above, violated Goldstein's and Larkai's Fourth Amendment rights to be free from unreasonable searches and seizures by government actors, as guaranteed under the United States Constitution.

84.

As alleged above, Deputy Johnson, Deputy Jane Doe, Deputy John Doe 1 began illegally searching Goldstein's/Larkai's U-Haul without consent and prior to the K-9's alleged "hit" for illegal narcotics.

85.

Additionally, and as alleged above, Deputy Johnson did not retrieve the K-9 to perform a sniff of the front cab of the U-Haul until *after* Deputy Johnson had searched [without any consent] the front cab area of the U-Haul for Goldstein's and Larkai's drivers' licenses and saw the clear zip-lock bag containing white oval pills stamped with "ES."

86.

Any reasonable police officer or sheriff deputy would know, or should have known, that Goldstein and Larkai had a clearly established constitutional right to be secure in their person and property from unreasonable searches and seizures under the Fourth Amendment.

87.

The conduct of Deputy Johnson, Lt. Shannon, Deputy Jane Doe, Deputy John Doe 1, and Deputy John Doe 2, as alleged above, also violated Goldstein's and Larkai's Fourth Amendment rights to be free from unreasonable searches and seizures by government actors, as guaranteed under the United States Constitution, when Deputy Johnson and the other Rapides Parish Sheriff deputies unlawfully seized and interrogated Goldstein and Larkai for approximately six (6) hours.

88.

The stop and seizure of Larkai and Goldstein by Deputy Johnson, Lt. Shannon, Deputy Jane Doe, Deputy John Doe 1, and Deputy John Doe 2 unnecessarily exceeded the time needed to handle the matter for which the stop was made and therefore constitutes an unreasonable seizure in violation of Larkai's and Goldstein's Fourth Amendment rights. This is evidenced by the fact that, after Deputy Johnson, Lt. Shannon, Deputy Jane Doe, Deputy John Doe 1, and Deputy John Doe 2 had questioned Larkai and Goldstein and searched their U-Haul during the stop on the side of Interstate-49 for at least an hour, Deputy Johnson, Lt. Shannon, Deputy Jane Doe, Deputy John Doe 1, and Deputy John Doe 2 did not release Larkai and Goldstein, nor did the deputies

immediately transport Larkai and Goldstein to jail, but rather chose to transport Larkai and Goldstein to the Rapides Parish Sheriff's RADE office to undergo an additional 2.5 hours of needless questioning and interrogation.

89.

The hour-plus long detainment and questioning of Larkai and Goldstein during the stop on Interstate-49 provided the deputies more than enough time to confirm or dispel any suspicions they had about Larkai's/Goldstein's potential criminal activity. There was no legal cause, probable cause, or articulable facts giving rise to reasonable suspicion of some other criminal activity to justify the prolonged and further detainment, questioning, and interrogation of Larkai and Goldstein for an additional 2.5 hours at the Rapides Parish Sheriff's RADE office.

90.

As a direct and proximate result of the conduct of Deputy Johnson, Lt. Shannon, Deputy Jane Doe, Deputy John Doe 1, and Deputy John Doe 2 who stopped, searched, and seized Goldstein and Larkai (including their personal property), Goldstein and Larkai suffered and continue to suffer extraordinary damages, including the prolonged loss of liberty, emotional distress, and trauma, loss of the enjoyment of life, psychological harm, as well as financial losses.

91.

Additionally, Larkai alleges that the basis of Deputy Johnson's decision to stop and seize Larkai [and Goldstein since he was inside the U-Haul with Larkai] after seeing Larkai drive past him on Interstate-49 was not because Larkai allegedly committed a lane violation, but was because Larkai was an African American driving a U-Haul moving van with an older white male [Goldstein] which caused Deputy Johnson to assume that Larkai and Goldstein were transporting illegal drugs.

92.

The fact that the District Attorney for the Ninth Judicial District for Rapides Parish dismissed Larkai's charges for improper driving in the left lane and for flight from an officer on August 9, 2022 shows that Deputy Johnson's alleged basis (*i.e.*, lane violation and flight) for deciding to pull Larkai over was baseless and supports a finding that the real reason Deputy Johnson pulled Larkai over was because Deputy Johnson saw that Larkai was African American and assumed that he was transporting illegal drugs.

93.

Additionally, the fact that Deputy Johnson, after seeing Larkai drive past him in the U-Haul on Interstate-49 near mile marker 99, waited a few minutes before pursuing the U-Haul and didn't immediately activate his sheriff vehicle's emergency red/blue lights once he was driving/following behind the U-Haul [which would have indicated to Larkai that the sheriff vehicle was attempting to pull him over] because Deputy Johnson was calling out mile markers over the radio to other Rapides Parish RADE deputies to join him for the stop, and then finally activated his emergency red/blue lights to make the stop once the other Rapides Parish RADE deputies were in place to quickly join him at the stop shows that Deputy Johnson's motive in pursuing and stopping Larkai's/Goldstein's U-Haul was not for a mere lane violation, but was because Deputy Johnson saw that Larkai was African American and assumed that he was transporting illegal drugs.

94.

Deputy Johnson's focus in stopping Larkai and Goldstein was that because Larkai was an African American traveling in a U-Haul moving van with an older white male southbound on Interstate-49, Larkai and/or Goldstein must be either in possession of illegal drugs, and/or transporting illegal drugs, or a drug runner.

95.

Deputy Johnson's stop and seizure of Larkai was based on Deputy Johnson's misguided and racially-based belief that the U-Haul Larkai was driving was transporting illegal drugs.

96.

Based on Deputy Johnson's racial profiling of Larkai, Deputy Johnson was determined to search Larkai's/Goldstein's U-Haul for drugs one way or another, even though Deputy Johnson lacked reasonable suspicion and probable cause to do so.

97.

Deputy Johnson's decision to stop, seize, and detain Larkai on the basis of Larkai's African American race was in violation of the Equal Protection Clause, which prohibits racially motivated enforcement of the laws.

98.

Upon information and belief, Deputy Johnson's decision to stop and seize Larkai on the basis of Larkai's African American race was performed in accordance with the Rapides Parish Sheriff's Office policy on racial profiling, which is merely a three (3) sentence policy that states: "The Purpose of this Policy is to ensure that race, ethnicity, age, gender, or sexual orientation shall not be the sole basis for the detention, interdiction or other disparate treatment of any individual by any employee of the Rapides Parish Sheriff's Office. This order shall apply to all members of the Rapides Parish Sheriff's Office. It shall be the policy of the Rapides Parish Sheriff's Office to prevent and prohibit the practice of racial profiling and/or other discriminatory practice(s) by employees of this office."

99.

The Rapides Parish Sheriff's Office policy on racial profiling encouraged Deputy Johnson to stop, seize, and detain Larkai on the basis of his race, but under the guise of an alleged lane violation so as to make it appear that the "sole basis" of Deputy Johnson's stop, seize, and detainment of Larkai was not based only on Larkai's African American race.

100.

The deprivation of Goldstein's and Larkai's rights under the Fourth and Fourteenth Amendments of the United States Constitution resulted from and were caused by an unconstitutional policy, custom, and/or practice of Sheriff Mark Wood, the Rapides Parish Police Jury, and the Rapides Parish Sheriff's Office that allows and encourages Rapides Parish Sheriff deputies to stop and seize individuals based on their race since the Rapides Parish Sheriff's Office policy does not prohibit Rapides Parish Sheriff deputies from considering an individual's race when deciding to stop, seize, and detain such individual.

101.

Upon information and belief, Sheriff Mark Wood, shortly after taking office in mid 2020, personally implemented and started the Rapides Parish RADE unit for the purpose of encouraging and permitting Rapides Parish Sheriff deputies to *target* individuals, such as Goldstein and Larkai, suspected of trafficking narcotics in the Central Louisiana area based on the individual's race and the type of vehicle they are driving, and regardless of whether or not there is probable cause or reasonable suspicion to stop and search the individual and his vehicle—all in violation of the United States Constitution and related state and federal laws prohibiting unreasonable searches and seizures.

102.

Sheriff Mark Wood, in both his individual and official capacity, authorized and approved the Rapides Parish RADE unit (and the RADE unit Sheriff deputies, including Deputy Johnson, Deputy Jane Doe, and Deputy John Doe 1) to make unjustified and illegal stops, searches, and seizures of vehicles (and drivers) driving in the Central Louisiana based on a deputy's belief that the vehicle may be transporting illegal narcotics.

103.

Pursuant to the Rapides Parish RADE unit policy of *targeting* individuals "suspected" of trafficking narcotics in the Central Louisiana, which was personally implemented and authorized by Sheriff Mark Wood in mid 2020, Deputy Johnson *targeted* Larkai and the U-Haul he was driving based on his subjective and speculative belief that Larkai and Goldstein were transporting illegal narcotics, and then stopped, seized, and conducted an illegal search of the U-Haul with the help of Deputy Jane Doe and Deputy John Doe 1 with the expectation that illegal narcotics would be found.

104.

In furtherance of Sheriff Mark Wood's official policy of *targeting* individuals "suspected" of trafficking narcotics in the Central Louisiana, Rapides Parish Sheriff deputies such as Deputy Johnson, Deputy Jane Doe, and Deputy John Doe 1 conducted an unreasonable and unjustified search and seizure of Goldstein/Larkai and their property in violation of their constitutional rights, and was the moving force and proximate cause of Goldstein's and Larkai's constitutional violations and resulting injuries.

105.

Sheriff Mark Wood's decision to take unlawful and *targeted* action against citizens such as Larkai and Goldstein by permitting, encouraging, and condoning Rapides Parish Sheriff

deputies (and RADE deputies) to conduct an illegal and warrantless search and seizure of their person and property in the hope that illegal narcotics will be found violates the Fourth Amendment right to be free from unreasonable searches and seizures by government actors such as Rapides Parish Sheriff deputies.

106.

Additionally, and upon information and belief, the Rapides Parish Sheriff Office policy regarding "arrests, search and seizure," which provides that "deputies shall not make any arrest, search or seizure that they know or should know is not in accordance with law and departmental procedures," is inadequate and insufficient to ensure that Rapides Parish Sheriff deputies do not violate citizens' constitutional rights because the policy does not state under what circumstances a person/property may be searched or seized, what can be searched for, under what circumstances a search and seizure is or is not reasonable, and makes no mention of whether the search and seizure requires probable cause or at a minimum, reasonable suspicion.

107.

Notwithstanding the inadequacy of the Rapides Parish Sheriff Office search and seizure policy, Deputy Johnson, Deputy Jane Doe, and Deputy John Doe 1 violated such policy by conducting a search and seizure of Goldstein's/Larkai's U-Haul that they knew or should have known was in violation of the law, as alleged above.

108.

However, upon information and belief, Deputy Johnson, Deputy Jane Doe, and Deputy John Doe 1 have not been disciplined, demoted, and/or terminated by Sheriff Mark Wood as a result of their violation of the Rapides Parish Sheriff Office search and seizure policy. The decision of Sheriff Mark Wood to not discipline, demote, and/or terminate Deputy Johnson, Deputy Jane

Doe, and Deputy John Doe 1 for violating the Rapides Parish Sheriff Office search and seizure policy (by conducting an illegal search and seizure in violation of Goldstein's and Larkai's constitutional rights) illustrates and implements an official policy, practice, or custom of tolerating violations of a citizen's constitutional rights and encourages Rapides Parish Sheriff deputies to conduct illegal searches and seizures of persons and their property in the hopes of finding illegal narcotics.

109.

The policies, practices, and customs of Sheriff Mark Wood and the Rapides Parish Sheriff's Office to target individuals suspected of trafficking narcotics and allow and/or condone Rapides Parish Sheriff deputies such as Deputy Johnson, Deputy Jane Doe, and Deputy John Doe 1 to conduct unreasonable searches and seizures in order to confirm and/or dispel the deputy's unsubstantiated suspicions that a person/vehicle may be transporting narcotics amounts to deliberate indifference to the constitutional rights of persons such as Goldstein and Larkai who are merely traveling through Central Louisiana.

110.

The deprivation of Goldstein's rights under Fourth Amendment and the deprivation of Larkai's rights under the Fourth and Fourteenth Amendments resulted from and were caused by (1) a policy, custom and/or practice of Sheriff Mark Wood and the Rapides Parish Sheriff's Office to employ unreasonable searches and seizures under the guise of taking illegal narcotics off the street; (2) by Sheriff Mark Wood's failure to adequately train his Sheriff deputies with respect to the manner and circumstances in which deputies are to conduct searches and seizures of persons and their property; and (3) by Sheriff Mark Wood's policy, practice, or custom of tolerating unreasonable and unconstitutional searches and seizures by his Sheriff deputies evidenced by his

decision to not discipline, demote, and/or terminate Deputy Johnson, Deputy Jane Doe, or Deputy John Doe 1 for violating both the Rapides Parish Sheriff Office search and seizure policy and the constitutional rights of Goldstein and Larkai.

112.

The decision of Sheriff Mark Wood to not discipline, demote, and/or terminate Deputy Johnson, Deputy Jane Doe, and Deputy John Doe 1 for violating the Rapides Parish Sheriff Office search and seizure policy (by conducting an illegal search and seizure in violation of Goldstein's and Larkai's constitutional rights) illustrates and implements an official policy, practice, or custom of tolerating violations of a citizen's constitutional rights and encourages Rapides Parish Sheriff deputies to conduct illegal searches and seizures of persons and their property in the hopes of finding illegal narcotics.

113.

As a result of the policies, practices, and/or customs of Sheriff Mark Wood and the Rapides Parish Sheriff's Office, Deputy Johnson's, Deputy Jane Doe's, and Deputy John Doe 1's unconstitutional behavior, as alleged above, was and is a custom of the Rapides Parish Sheriff's Office that it is perfectly acceptable, as evidenced by Lt. Shannon's and Deputy John Doe 2's failure to intervene and stop Deputy Johnson, Deputy Jane Doe, and Deputy John Doe 1 from conducting the illegal search of Goldstein's and Larkai's U-Haul.

114.

Once Goldstein and Larkai arrived at the Rapides Parish Detention Center (Center 1), they were told to sit on a bench and wait to be processed. At that time, Goldstein asked for water and to make a phone call, but his request went unanswered.

115.

After waiting for some time, Goldstein was eventually taken to the medical area/nurses' office of the Rapides Parish Detention Center (Center 1) for medical evaluation.

116.

Upon information and belief, Defendant Nortec, LLC is a private medical and mental health care provider that was, at all times relevant hereto, under contract with the Rapides Parish Sheriff's Office and/or the Rapides Parish Detention Center to provide medical and mental health treatment and care to the individuals detained, such as Goldstein, and incarcerated at the Rapides Parish Detention Center.

117.

During Goldstein's medical evaluation, Nurse Jane Doe, who is an employee of Defendant Nortec, LLC and was acting in the course and scope of her employment for Nortec, LLC, took Goldstein's blood pressure—which was 188/95—and asked him various questions.

118.

During the medical evaluation, Goldstein told Nurse Jane Doe that he was feeling very weak, that he was feeling very faint, that he was feeling very light-headed, that he was feeling hypoglycemic, and that he needed water and food. Goldstein explicitly informed Nurse Jane Doe that something was wrong with him and that he needed medical attention.

119.

However, Nurse Jane Doe completely ignored Goldstein's complaints and requests for medical attention, and did not provide Goldstein with any food or water.

120.

Additionally, Nurse Jane Doe did not do anything about, or express any concern over, the fact that Goldstein's blood pressure was 188/95, even though a blood pressure of 188/95 is

indicative of Hypertension Stage 3 (a hypertensive crisis), which is a medical emergency that requires hospitalization and immediate medical attention.

121.

After completing his medical evaluation, Goldstein was taken to a room where he was strip-searched by Rapides Parish Detention Center (Center 1) staff. Goldstein again expressed [to the Rapides Parish Detention Center (Center 1) employee that was strip-searching him] that he was not feeling good, that he was feeling very faint, that he was feeling very light-headed, that he was feeling hypoglycemic, and that he needed water. However, the Rapides Parish Detention Center (Center 1) employee didn't care, did nothing about Goldstein's medical complaints, and did not give Goldstein any water.

123.

After being strip-searched, Goldstein was brought to a holding cell along with Larkai.

124.

Once Goldstein was in the holding cell, he continued to tell the Rapides Parish Detention Center (Center 1) officials/staff that he was not feeling well and that he needed water and to make a phone call. However, Goldstein's complaints and requests continued to fall on deaf ears, and he continued to sit in the holding cell for hours without any food, water, medical attention, or phone calls.

125.

At some point during the time Goldstein was sitting in the holding cell with Larkai, the jail officials/staff took Goldstein out of the holding cell and brought him elsewhere in the jail for additional questioning by jail officials/staff. During this time of additional questioning, Goldstein again told the jail officials/staff that he was feeling very weak, was feeling dizzy, and was not

feeling well at all. In fact, Goldstein happened to see Nurse Jane Doe during this time and told her, once again, that he was feeling very weak, was feeling dizzy, and was not feeling well at all.

126.

Given Goldstein's high blood pressure level and his continued complaints of feeling faint, weak, dizzy, light-headed, and hypoglycemic, it was evident that Goldstein was having a medical emergency requiring immediate medical attention.

127.

However, the Rapides Parish Detention Center (Center 1) officials/staff, including Nurse Jane Doe, continued to ignore Goldstein's medical condition and complaints, and just threw Goldstein back into the holding cell with no food, no water, and no medical attention.

128.

Neither Nurse Jane Doe nor any other Rapides Parish Detention Center (Center 1) officials/staff ever questioned or inquired into Goldstein's medical emergency/condition and complaints, and no one ever contacted or summoned any emergency medical services to further evaluate or render medical assistance to Goldstein during the time he was an inmate at the Rapides Parish Detention Center (Center 1).

129.

These actions and/or inactions of the Rapides Parish Detention Center (Center 1) officials/staff, including those of Nurse Jane Doe, showed a deliberate indifference to Goldstein's medical emergency and serious medical needs for which the Rapides Parish Detention Center (Center 1) officials/staff and Nurse Jane Doe had knowledge of.

130.

Goldstein and Larkai were eventually released from the Rapides Parish Detention Center (Center 1) on their own recognizance at approximately 6:30 p.m. on July 7, 2022, and later checked into a hotel in Alexandria, LA.

131.

At approximately 7:30 p.m. on July 7, 2022, while Goldstein was walking down the hall of the hotel, Goldstein collapsed to the floor.

132.

Goldstein was then rushed via ambulance to the Rapides Regional Medical Center, ICU department, for evaluation and medical treatment.

133.

After undergoing testing and evaluation at the Rapides Regional Medical Center, Goldstein's treating physicians determined that Goldstein had been suffering from an acute ischemic left MCA stroke; an acute ischemic right MCA stroke; Hypokalemia; and an acute kidney injury (AKI).

134.

The Rapides Regional Medical Center medical personnel informed Goldstein that he could have died had he not been taken to the hospital and properly treated sooner.

135.

However, as a result of Nurse Jane Doe's and the Rapides Parish Detention Center (Center 1) officials/staff's failure to recognize that Goldstein was suffering a serious medical condition that needed immediate medical attention, and their failure to provide Goldstein with *any* medical attention and treatment pursuant to Goldstein's repeated request for the same, Goldstein suffered a stroke and now has permanent injuries and damages, including slurred speech, memory loss,

decreased motor function, trouble sleeping, severe mental and emotional distress and depression, as well as financial losses and medical expenses.

136.

As a direct consequence and result of the failure by the Rapides Parish Detention Center (Center 1) officials/staff, including the failure by Nurse Jane Doe to recognize that Goldstein was suffering a serious medical condition that needed immediate medical attention and to provide any medical care to Goldstein, Goldstein endured prolonged and unnecessary pain and suffering; has a substantially longer period of recovery—and may not ever recover; and suffered, and continues to suffer, permanent injuries and damages, including slurred speech, memory loss, decreased motor function, trouble sleeping, severe mental and emotional distress and depression, as well as financial losses and medical expenses.

137.

If the Rapides Parish Detention Center (Center 1) officials/staff, including Nurse Jane Doe, had recognized that Goldstein was suffering a serious medical condition that needed immediate medical attention and provided Goldstein with such emergency medical attention as requested, Goldstein would not have suffered such permanent injuries and damages—or at least not to the extent that Goldstein suffered and is currently suffering from. This is particularly true when someone is suffering from a stroke—which was the case here—where each and every minute's delay in receiving medical treatment is crucial to one's prognosis and recovery.

138.

Given Goldstein's high blood pressure level and his continued complaints of feeling faint, weak, dizzy, light-headed, and hypoglycemic, it would have been obvious to any reasonable person

in Nurse Jane Doe's position that Goldstein was in fact suffering from a serious medical condition that required prompt medical attention.

139.

Any reasonable person in Nurse Jane Doe's position would have certainly recognized that Goldstein's behavior, statements, and requests were obvious signs of an objectively serious medical condition that requires medical attention.

140.

Further, a reasonable person in Nurse Jane Doe's position would have recognized that failing to seek or provide prompt medical attention to Goldstein violates the Goldstein's clearly established rights under federal law and Louisiana law.

141.

Yet, neither Nurse Jane Doe nor any other member of the Rapides Parish Detention Center (Center 1) staff took any steps to provide or secure such medical attention for Goldstein, and nor did Nurse Jane Doe or any other member of the Rapides Parish Detention Center (Center 1) staff seem to even care or show any concern for Goldstein's medical emergency complaints and requests.

142.

The decision of the Rapides Parish Detention Center (Center 1) staff, including Nurse Jane Doe, to ignore Goldstein's medical emergency and complaints, under the circumstances described above and herein, was substantially certain to result in serious bodily injury or loss of life, and were the cause-in-fact of Goldstein's injuries.

143.

Nurse Jane Doe and the Rapides Parish Detention Center (Center 1) staff disregarded an obvious substantial risk of harm to Goldstein by failing to take any reasonable measures to abate said risk of harm and therefore acted with deliberate indifference to Goldstein's serious medical needs during the time Goldstein was in the custody of Rapides Parish Detention Center (Center 1).

144.

Nurse Jane Doe's and the Rapides Parish Detention Center (Center 1) staff's denial of medical care to Goldstein was done with deliberate indifference to Goldstein's medical emergency and serious medical needs and was in breach Nurse Jane Doe's and the Rapides Parish Detention Center (Center 1) staff's duty under federal and Louisiana law to provide reasonable medical services to Goldstein while he was a pre-trial detainee.

145.

Nurse Jane Doe and the Rapides Parish Detention Center (Center 1) staff were acting under color of state law and within the scope of their authority when they denied reasonable medical care to Goldstein and deprived Goldstein of his liberty and was in violation of the laws of Louisiana and Article 1, §2; Article 1, §3; and Article 1, §5 of the Louisiana Constitution as well as Goldstein's rights as a pre-trial detainee under the 14th Amendment of the Constitution of the United States.

146.

Sheriff Mark Wood, Nurse Jane Doe, Nortec, LLC, and the Rapides Parish Detention Center (Center 1) staff failed to provide Goldstein with safe conditions of confinement by intentionally denying him medical care and treatment while he was a pre-trial detainee at the Rapides Parish Detention Center (Center 1).

147.

The failure of Sheriff Mark Wood, Nurse Jane Doe, Nortec, LLC, and the Rapides Parish Detention Center (Center 1) staff to provide Goldstein with medical care and treatment in response to Goldstein's serious medical emergency and complaints put Goldstein a substantial risk of suffering serious harm, and did cause Goldstein to suffer serious harm.

148.

At no point did Sheriff Mark Wood, Nurse Jane Doe, Nortec, LLC, or the Rapides Parish Detention Center (Center 1) staff take reasonable and available measures to abate or reduce the risk of serious harm to Goldstein, even though a reasonable person under the circumstances would have understood the high degree of risk involved—making the consequences of the Defendants' conduct obvious.

149.

The refusal of Nurse Jane Doe and the Rapides Parish Detention Center (Center 1) staff to provide Goldstein with any medical attention, and their decision to completely ignore Goldstein's numerous medical complaints and requests for medical attention clearly evidenced a wanton disregard for Goldstein's serious medical needs and well-being.

150.

The failures of Sheriff Mark Wood, Nurse Jane Doe, Nortec, LLC, and the Rapides Parish Detention Center staff with respect to their denial of medical care to Goldstein were well known and consistent with a pattern and practice of similar incidents resulting in a deliberate indifference to the serious medical needs of detainees like Goldstein at the Rapides Parish Detention Center. There have been numerous lawsuits filed against the Sheriff of Rapides Parish Detention Center, its employees, its warden, Nortec, LLC, and Nortec, LLC staff, which are identified below, that demonstrate a practice and pattern of similar constitutional violations that indicate the existence

of an informal custom or practice that violates detainees' state and federal rights to receive adequate medical care:

A. On August 5, 2022, representatives of Jason Marler filed suit against Rapides Parish Sheriff Wood, an unknown medical service provider for detainees/inmates at the Rapides Parish Detention Center, as well as other employees of the Rapides Parish Detention Center alleging that the defendants denied Jason Marler reasonable and necessary medical care while he was being held in the Rapides Parish Detention Center. *See Marler v. Sheriff Mark Wood*, Case No. 1:22-cv-02460 (W.D. La.).

B. On July 18, 2016, James Robinson filed suit against Rapides Parish Sheriff Hilton, the warden of the Rapides Parish Detention Center, Nortec, LLC, Nortec, LLC nurse Christy, and various other employees of the Rapides Parish Detention Center alleging that the defendants denied him reasonable and necessary medical care while he was being held in the Rapides Parish Detention Center. Mr. Robinson even alleged that while he was being escorted to isolation, he happened to see nurse Christy in the hallway and requested medical care for his head and rib injuries, but that nurse Christy ignored his medical requests. Mr. Robinson further alleged that the defendants were deliberately indifferent to his serious medical needs. *See Robinson v. Rapides Parish Sheriff Hinton*, Case No. 1:16-cv-01058 (W.D. La.).

C. On March 2, 2019, Jordan Arnold filed suit against Rapides Parish Sheriff Hilton and various other employees of the Rapides Parish Detention Center alleging, *inter alia*, that the defendants denied him reasonable and necessary medical care while he was being held in the Rapides Parish Detention Center. *See Arnold v. Rapides Parish Sheriff Hilton*, Case No. 1:19-cv-00270 (W.D. La.).

D. On February 22, 2021, Avery Eskew filed suit against Rapides Parish Sheriff Wood, Nortec, LLC, Nortec, LLC nurse Felicia, and various other employees of the Rapides Parish Detention Center alleging that the defendants denied him reasonable and necessary medical care while he was being held in the Rapides Parish Detention Center. Mr. Eskew alleged that he made numerous requests for medical care to treat his injuries that he sustained during an attack in jail, but that nurse Felicia denied him medical care. *See Eskew v. Rapides Parish Sheriffs Office*, Case No. 1:21-cv-00479 (W.D. La.).

E. On November 3, 2014, Kyle Hauenstein filed suit against Rapides Parish Sheriff Hilton, the Rapides Parish Detention Center (center 1) warden, and various other defendants alleging that he made numerous requests for medical care regarding an infection in his foot, but that the defendants denied him reasonable and necessary medical care while he was being held in the Rapides Parish Detention Center, which consequently resulted in Mr. Hauenstein losing part of his foot. *See Hauenstein v. Rapides Parish Sheriff*, Case No. 1:14-cv-03188 (W.D. La.).

F. On January 25, 2021, John Henry Scott, Jr. filed suit against various employees of the Rapides Parish Detention Center, including nurse Felicia, alleging that he made

numerous requests for medical care regarding his head injury, but that the defendants denied him reasonable and necessary medical care while he was being held in the Rapides Parish Detention Center. *See Scott v. Hall*, Case No. 1:21-cv-00204 (W.D. La.).

G. In 2017, John Broskey, Jr. filed suit against various employees and medical personnel of the Rapides Parish Detention Center alleging that he made numerous requests for medical care regarding his health problems and that his health problems were getting worse, but that the defendants denied him reasonable and necessary medical care while he was being held in the Rapides Parish Detention Center. *See Borskey v. Rapides Parish Detention Center*, Case No. 1:17-cv-00451 (W.D. La.).

H. On April 24, 2015, Jeffrey Gibson filed suit against Rapides Parish Sheriff Hilton and various employees of the Rapides Parish Detention Center alleging that he requested medical care for what was later diagnosed as a kidney infection, but that the defendants denied him reasonable and necessary medical care for 4 days while he was being held in the Rapides Parish Detention Center. Mr. Gibson further alleged that he suffered kidney damage as a result of the delay in his medical treatment. Ultimately, Mr. Gibson's denial of medical care claim was dismissed due to his claim being prescribed. *See Gibson v. Hilton*, Case No. 1:15-cv-01230 (W.D. La.).

I. On March 27, 2018, Amy Ducote (on behalf of her minor child) filed suit against Rapides Parish Sheriff Hilton and Nortec, LLC alleging that on April 1, 2017, while Larry Jenkins (the father of Amy Ducote's child) was incarcerated at the Rapides Parish Detention Center, Mr. Jenkins complained to the jail deputies and the Nortec, LLC nursing staff that he was not feeling well, had physical pain, and had a headache. Mr. Jenkins was found dead in his jail cell several hours later. Plaintiff alleged that, despite Mr. Jenkins' complaints of pain, not feeling well, and headaches, the jail deputies and the Nortec, LLC nursing staff failed to render assistance or aid to Mr. Jenkins, failed to call a doctor or nurse to examine him, and failed to provide him with and call for medical treatment. Plaintiff further alleged that Mr. Jenkins developed a sudden change in his health approximately 6 hours prior to his death, and during that time, the jail deputies and the Nortec, LLC nursing staff never took Mr. Jenkins' vital signs. Plaintiff alleged that the jail deputies/staff and the Nortec, LLC nursing staff were negligent in failing to transport Mr. Jenkins to a hospital or doctor's office, or call medical staff to evaluate him during the 6 hour time period that he was complaining of feeling ill and had been requesting medical attention. *See Amy Ducote, et al. v. William Earl Hilton and Nortec, LLC*, Case No. 261471-E (9th JDC for Parish of Rapides).

J. On October 31, 2016, Rhonda Cotten filed suit against Rapides Parish Sheriff William Hilton and the Louisiana Department of Corrections alleging that on January 27, 2016, she was incarcerated at the Rapides Parish Detention Center 1 and during that time, she told the jail deputies/staff on numerous occasions that she needed her daily medication, but that she was not given all of her prescribed medication. Ms. Cotten alleged that during the time of her incarceration, she experienced a psychotic episode with hallucinations due to the lack of medication. Ms. Cotten alleged that, despite her

emotional condition and physical injury, she was not given proper medical attention and care. Ms. Cotten alleged that the defendants were negligent and at fault for, inter alia, failing to ascertain inmate medical conditions. Ms. Cotten subsequently filed an amended petition on April 11, 2018 naming Nortec, LLC as a defendant and alleged that she verbalized her need for daily medication numerous times to the jail deputies/staff and the Nortec, LLC medical staff, but that the staff failed to administer her medication, subsequently causing her to sustain injuries and health problems. *See Rhonda Cotten v. William Hilton, et al.*, Case No. 257236-F (9th JDC for Parish of Rapides).

K. On June 9, 2022, Reuben Anderson filed an amended petition for damages against Rapides Parish Sheriff Mark Wood, Rapides Parish Detention Center Warden Jay Slayter, Nortec, LLC, and a Rapides Parish Sheriff deputy due to the denial of medical care while he was being detained at the Rapides Parish Detention Center. Mr. Anderson alleged that on July 27, 2021, he woke up and found a mass of blood in his right eye, that his vision in his right eye had become blurry, and that he immediately sought medical attention to have an eye examination. The following day, Mr. Anderson was examined by a Nortec, LLC nurse, however, Mr. Anderson alleged that the nurse had no experience or special training in ophthalmology and nevertheless failed to call a doctor or send Mr. Anderson for further medical attention and evaluation. Mr. Anderson alleged that the nurse did not think his eye issue was serious. Weeks later, Mr. Anderson was taken to an eye doctor on August 13, 2021 and the doctor explained that Mr. Anderson likely had a retinal stroke and that he needed to see a specialist immediately. Mr. Anderson then saw a specialist and was advised that he had a detached retina and that he needed to undergo an emergency operation to save his eyesight. The surgery was scheduled for August 27, 2021, however, the jail sheriff deputy refused to transport Mr. Anderson for his surgery. Following August 27, 2021, Mr. Anderson repeatedly reported to medical complaining that his vision was getting worse and worse and requested medical attention. Mr. Anderson eventually underwent surgery on September 28, 2021, but due to his delay [caused by the jail deputies/staff and the Nortec, LLC medical staff] in receiving appropriate medical attention, Mr. Anderson permanently lost his vision in his right eye. Mr. Anderson alleged that his injuries were caused by the jail deputies/staff and the Nortec, LLC medical staff's failure to provide him with timely and appropriate medical treatment/attention in violation of his rights. *See Reuben Anderson v. Warden Jay Slayter, et al.*, Case No. 273849-E (9th JDC for Parish of Rapides).

151.

These above numerous, yet non-exhaustive, examples show actual and/or constructive knowledge of, and are evidence of, the deficient policies and customs with respect to assessing and treating Rapides Parish Detention Center detainees and inmates for health problems, health complaints, and requests for medical attention, and those deficiencies directly caused or led to the

failure to properly and adequately assess, treat, and respond to Goldstein's health problems, health complaints, and requests for medical attention were the moving force behind Goldstein's injuries resulting from the denial of appropriate medical care and treatment.

152.

Based on the foregoing, Sheriff Mark Wood, the Rapides Parish Police Jury, Nortec, LLC, and the Rapides Parish Detention Center staff knew and were on notice that detainees and inmates of the Rapides Parish Detention Center were being denied adequate medical care and treatment, and that the requests for medical care and attention by detainees and inmates were being ignored by Nortec, LLC medical staff and the Rapides Parish Detention Center staff before and during the time of Goldstein's detainment at the Rapides Parish Detention Center.

153.

However, Sheriff Mark Wood, the Rapides Parish Police Jury, Nortec, LLC, and the Rapides Parish Detention Center staff did not and has not changed it policies and practices with respect to assessing, providing, and responding to the health concerns and requests for medical attention by detainees and inmates.

154.

At the time of Goldstein's detainment at Rapides Parish Detention Center (Center 1), Sheriff Mark Wood, the Rapides Parish Police Jury, Nortec, LLC, and the Rapides Parish Detention Center staff knew, or should have known, of continuing serious deficiencies in policies, practices and procedures at the jail related to assessing, providing, and responding to the health conditions and health care requests of detainees and inmates.

155.

Sheriff Mark Wood, the Rapides Parish Police Jury, Nortec, LLC, and the Rapides Parish Detention Center staff knew, or should have known, that the staff (including medical staff) at

Rapides Parish Detention Center (Center 1) were inadequate or unwilling to protect or provide adequate treatment to a person with serious health condition and who requests medical attention, and that the staff that existed were inadequately trained or supervised with regard to assessing, providing, and responding to the health conditions, health complaints, and health care requests of detainees and inmates.

156.

Sheriff Mark Wood, the Rapides Parish Police Jury, Nortec, LLC, and the Rapides Parish Detention Center staff's failure to maintain the Rapides Parish Detention Center (Center 1) in accordance with "Basic Jail Guidelines" was in deliberate indifference to the medical needs of Goldstein.

157.

Nurse Jane Doe and the Rapides Parish Detention Center staff were inadequately trained to recognize when an individual, like Goldstein, may be suffering from a stroke or other serious medical condition that requires immediate medical attention or meaningfully participate in the individual's medical treatment and risk assessment.

158.

Sheriff Mark Wood failed to train the Rapides Parish Detention Center staff on how to recognize serious health conditions and on how to adequately assess and respond to the health conditions and health complaints by detainees such as Goldstein.

159.

An adequately trained and supervised jail staff (and medical staff) would have recognized that Goldstein was suffering from serious health condition that required immediate medical

attention and would not have flat out ignored Goldstein's numerous health complaints and requests for medical attention.

160.

As alleged herein, there are a series of unresolved, systemic deficiencies that show the existence of a *de facto* policy of the Nortec, LLC medical staff and the Rapides Parish Detention Center staff failing to adequately assess, treat, and respond to the health conditions, health complaints, and requests for medical attention by inmates and detainees of the Rapides Parish Detention Centers.

161.

As the result of *de facto* policies and practices permitted by Sheriff Mark Wood and Nortec, LLC to ignore detainees' serious medical conditions and requests for medical attention, Nurse Jane Doe, the Nortec, LLC medical staff, and the Rapides Parish Detention Center staff did not provide Goldstein sufficient access to reasonable medical care, but instead, ignored his repeated requests for medical attention and ignored objective evidence (*i.e.*, Goldstein's extremely high blood pressure rate) that Goldstein was in fact suffering from a serious medical condition that required immediate medical treatment.

162.

Nortec, LLC failed to adequately staff and train its employees, such as Nurse Jane Doe, responsible for providing constitutionally adequate medical health care to detainees and inmates at the Rapides Parish Detention Center.

163.

As a result of *de facto* policies and practices permitted by Sheriff Mark Wood, Rapides Parish Police Jury, and Nortec, LLC, the Rapides Parish Detention Center staff and Nortec, LLC

medical staff is not trained and/or supervised to address the health care needs of detainees and inmates and, as a consequence, choose to ignore detainees' and inmates' serious health conditions and requests for medical attention, resulting in deliberate indifference to detainees' and inmates' health care needs.

164.

The actions and inactions of Sheriff Mark Wood, Rapides Parish Police Jury, Nurse Jane Doe, Nortec, LLC, and the Rapides Parish Detention Center staff were reckless, willful, wanton, and malicious, and constituted deliberate indifference to the rights of Goldstein and were the proximate cause of Goldstein's injuries and damages.

165.

As a direct result and proximate result of the conduct of Sheriff Mark Wood, Deputy Johnson, Lt. Shannon, Deputy Jane Doe, Deputy John Doe 1, and Deputy John Doe 2, the Rapides Parish Police Jury, Nurse Jane Doe, and Nortec, LLC, Goldstein and Larkai suffered and continues to suffer extraordinary damages and injuries, including emotional distress, trauma, loss of the enjoyment of life, psychological injuries, physical pain and suffering, and financial and losses, all of which the Defendants are jointly, severally, and/or *in solido* liable to Goldstein and Larkai for.

**CAUSES OF ACTION**

**Count I**
**Violation of 42 U.S.C. § 1983:**
**Violation of Fourth Amendment Right to be Free from Unlawful Searches and Seizures**
**(Goldstein and Larkai Against Deputy Johnson, Deputy Jane Doe, and Deputy John Doe 1)**

166.

Goldstein and Larkai repeat, reiterate and re-allege every allegation contained in Paragraphs 1 through 165 of this Petition for Damages with the same force and effect as if fully set forth herein:

167.

As alleged above herein, the actions of Deputy Johnson, Deputy Jane Doe, and Deputy John Doe 1 in stopping and seizing Goldstein and Larkai for a prolonged period of time, and by conducting an unreasonable and illegal search of their U-Haul and personal belongings without consent, without a warrant, and without probable cause or reasonable suspicion violated Goldstein's and Larkai's constitutional rights to be free from unlawful searches and seizures as guaranteed by the Fourth Amendment of the United States Constitution.

168.

As a result of the actions of and constitutional violations by Deputy Johnson, Deputy Jane Doe, and Deputy John Doe 1, as alleged herein, Goldstein and Larkai have suffered damages including: (1) the loss of liberty and freedom; (2) mental and emotional injury; (3) physical injury, pain and suffering; (4) financial losses; and (5) any other special and general damages and expenses, in an amount to be proven at trial.

**Count II**
**Violation of 42 U.S.C. § 1983:**
**Violation of Equal Protection Clause**
**(Larkai Against Deputy Johnson)**

169.

Larkai repeats, reiterates and re-alleges every allegation contained in Paragraphs 1 through 165of this Petition for Damages with the same force and effect as if fully set forth herein:

170.

As alleged above, Deputy Johnson's decision to stop, seize, and detain Larkai was based on Larkai's African American race in violation of the Equal Protection Clause, which prohibits racially motivated enforcement of the laws.

171.

As a result of the actions of and constitutional violations by Deputy Johnson, Larkai has suffered damages including: (1) the loss of liberty and freedom; (2) mental and emotional injury; (3) physical injury, pain and suffering; (4) financial losses; and (5) any other special and general damages and expenses, in an amount to be proven at trial.

**Count III**
**Violation of 42 U.S.C. § 1983:**
**Failure to Intervene/Bystander Liability**
**(Goldstein and Larkai Against Lt. Shannon and Deputy John Doe 2)**

172.

Goldstein and Larkai repeat, reiterate and re-allege every allegation contained in Paragraphs 1 through 165 of this Petition for Damages with the same force and effect as if fully set forth herein:

173.

As alleged above, Lt. Shannon and Deputy John Doe 2 were present for and witnessed Deputy Johnson, Deputy Jane Doe, and Deputy John Doe violating Goldstein's and Larkai's constitutional rights to be free from unlawful searches and seizures, but Lt. Shannon and Deputy John Doe 2 failed to intervene to prevent and/or stop Deputy Johnson, Deputy Jane Doe, and Deputy John Doe 1 from violating Goldstein's and Larkai's constitutional rights to be free from unlawful searches and seizures as guaranteed by the Fourth Amendment of the United States Constitution.

174.

Lt. Shannon and Deputy John Doe 2 knew that the actions of Deputy Johnson, Deputy Jane Doe, and Deputy John Doe were in violation of Goldstein's and Larkai's constitutional rights to be free from unlawful searches and seizures.

175.

Lt. Shannon and Deputy John Doe 2 had sufficient time and a reasonable opportunity to prevent and/or stop Deputy Johnson, Deputy Jane Doe, and Deputy John Doe from violating Goldstein's and Larkai's constitutional rights to be free from unlawful searches and seizures.

176.

Yet, Lt. Shannon and Deputy John Doe 2 chose not to act so as to stop or prevent the constitutional violations being committed by Deputy Johnson, Deputy Jane Doe, and Deputy John Doe against Goldstein and Larkai.

177.

As a result of the actions and/or inactions of Lt. Shannon and Deputy John Doe 2, Goldstein and Larkai have suffered damages including: (1) the loss of liberty and freedom; (2) mental and emotional injury; (3) physical injury, pain and suffering; (4) financial losses; and (5) any other special and general damages and expenses, in an amount to be proven at trial.

**Count IV**
**Violation of 42 U.S.C. § 1983: *Monell* Claims**
**(Goldstein and Larkai Against Sheriff Mark Wood in His Individual and Official Capacity)**

178.

Goldstein and Larkai repeat, reiterate and re-allege every allegation contained in Paragraphs 1 through 165 of this Petition for Damages with the same force and effect as if fully set forth herein:

179.

As alleged above herein, the actions of Deputy Johnson, Deputy Jane Doe, and Deputy John Doe 1 in stopping and seizing Goldstein and Larkai for a prolonged period of time, and by conducting an unreasonable and illegal search of their U-Haul and personal belongings without consent, without a warrant, and without probable cause or reasonable suspicion violated

Goldstein's and Larkai's constitutional rights to be free from unlawful searches and seizures as guaranteed by the Fourth Amendment of the United States Constitution.

180.

The deprivation of Goldstein's and Larkai's rights under the Fourth and Fourteenth Amendments of the United States Constitution resulted from and were caused by an unconstitutional policy, custom, and/or practice of Sheriff Mark Wood, the Rapides Parish Police Jury, and the Rapides Parish Sheriff's Office that allows and encourages Rapides Parish Sheriff deputies to stop and seize individuals based on their race since the Rapides Parish Sheriff's Office policy does not prohibit Rapides Parish Sheriff deputies from considering an individual's race when deciding to stop, seize, and detain such individual.

181.

Upon information and belief, Sheriff Mark Wood, shortly after taking office in mid 2020, personally implemented and started the Rapides Parish RADE unit for the purpose of encouraging and permitting Rapides Parish Sheriff deputies to *target* individuals, such as Goldstein and Larkai, suspected of trafficking narcotics in the Central Louisiana area based on the individual's race and the type of vehicle they are driving, and regardless of whether or not there is probable cause or reasonable suspicion to stop and search the individual and his vehicle—all in violation of the United States Constitution and related state and federal laws prohibiting unreasonable searches and seizures.

182.

Sheriff Mark Wood, in both his individual and official capacity, authorized and approved the Rapides Parish RADE unit (and the RADE unit Sheriff deputies, including Deputy Johnson, Deputy Jane Doe, and Deputy John Doe 1) to make unjustified and illegal stops, searches, and

seizures of vehicles (and drivers) driving in the Central Louisiana based on a deputy's belief that the vehicle may be transporting illegal narcotics.

183.

Pursuant to the Rapides Parish RADE unit policy of *targeting* individuals "suspected" of trafficking narcotics in the Central Louisiana, which was personally implemented and authorized by Sheriff Mark Wood in mid 2020, Deputy Johnson *targeted* Larkai and the U-Haul he was driving based on his subjective and speculative belief that Larkai and Goldstein were transporting illegal narcotics, and then stopped, seized, and conducted an illegal search of the U-Haul with the help of Deputy Jane Doe and Deputy John Doe 1 with the expectation that illegal narcotics would be found.

184.

In furtherance of Sheriff Mark Wood's official policy of *targeting* individuals "suspected" of trafficking narcotics in the Central Louisiana, Rapides Parish Sheriff deputies such as Deputy Johnson, Deputy Jane Doe, and Deputy John Doe 1 conducted an unreasonable and unjustified search and seizure of Goldstein/Larkai and their property in violation of their constitutional rights, and was the moving force and proximate cause of Goldstein's and Larkai's constitutional violations and resulting injuries.

185.

Sheriff Mark Wood's decision to take unlawful and *targeted* action against citizens such as Larkai and Goldstein by permitting, encouraging, and condoning Rapides Parish Sheriff deputies (and RADE deputies) to conduct an illegal and warrantless search and seizure of their person and property in the hope that illegal narcotics will be found violates the Fourth Amendment

right to be free from unreasonable searches and seizures by government actors such as Rapides Parish Sheriff deputies.

186.

Additionally, and upon information and belief, the Rapides Parish Sheriff Office policy regarding "arrests, search and seizure," which provides that "deputies shall not make any arrest, search or seizure that they know or should know is not in accordance with law and departmental procedures," is inadequate and insufficient to ensure that Rapides Parish Sheriff deputies do not violate citizens' constitutional rights because the policy does not state under what circumstances a person/property may be searched or seized, what can be searched for, under what circumstances a search and seizure is or is not reasonable, and makes no mention of whether the search and seizure requires probable cause or at a minimum, reasonable suspicion.

187.

Notwithstanding the inadequacy of the Rapides Parish Sheriff Office search and seizure policy, Deputy Johnson, Deputy Jane Doe, and Deputy John Doe 1 violated such policy by conducting a search and seizure of Goldstein's/Larkai's U-Haul that they knew or should have known was in violation of the law, as alleged above.

188.

However, upon information and belief, Deputy Johnson, Deputy Jane Doe, and Deputy John Doe 1 have not been disciplined, demoted, and/or terminated by Sheriff Mark Wood as a result of their violation of the Rapides Parish Sheriff Office search and seizure policy. The decision of Sheriff Mark Wood to not discipline, demote, and/or terminate Deputy Johnson, Deputy Jane Doe, and Deputy John Doe 1 for violating the Rapides Parish Sheriff Office search and seizure policy (by conducting an illegal search and seizure in violation of Goldstein's and Larkai's

constitutional rights) illustrates and implements an official policy, practice, or custom of tolerating violations of a citizen's constitutional rights and encourages Rapides Parish Sheriff deputies to conduct illegal searches and seizures of persons and their property in the hopes of finding illegal narcotics.

189.

The policies, practices, and customs of Sheriff Mark Wood and the Rapides Parish Sheriff's Office to target individuals suspected of trafficking narcotics and allow and/or condone Rapides Parish Sheriff deputies such as Deputy Johnson, Deputy Jane Doe, and Deputy John Doe 1 to conduct unreasonable searches and seizures in order to confirm and/or dispel the deputy's unsubstantiated suspicions that a person/vehicle may be transporting narcotics amounts to deliberate indifference to the constitutional rights of persons such as Goldstein and Larkai who are merely traveling through Central Louisiana.

190.

The deprivation of Goldstein's rights under Fourth Amendment and the deprivation of Larkai's rights under the Fourth and Fourteenth Amendments resulted from and were caused by (1) a policy, custom and/or practice of Sheriff Mark Wood and the Rapides Parish Sheriff's Office to employ unreasonable searches and seizures under the guise of taking illegal narcotics off the street; (2) by Sheriff Mark Wood's failure to adequately train his Sheriff deputies with respect to the manner and circumstances in which deputies are to conduct searches and seizures of persons and their property; and (3) by Sheriff Mark Wood's policy, practice, or custom of tolerating unreasonable and unconstitutional searches and seizures by his Sheriff deputies evidenced by his decision to not discipline, demote, and/or terminate Deputy Johnson, Deputy Jane Doe, or Deputy

John Doe 1 for violating both the Rapides Parish Sheriff Office search and seizure policy and the constitutional rights of Goldstein and Larkai.

191.

The decision of Sheriff Mark Wood to not discipline, demote, and/or terminate Deputy Johnson, Deputy Jane Doe, and Deputy John Doe 1 for violating the Rapides Parish Sheriff Office search and seizure policy (by conducting an illegal search and seizure in violation of Goldstein's and Larkai's constitutional rights) illustrates and implements an official policy, practice, or custom of tolerating violations of a citizen's constitutional rights and encourages Rapides Parish Sheriff deputies to conduct illegal searches and seizures of persons and their property in the hopes of finding illegal narcotics.

192.

As a result of the policies, practices, and/or customs of Sheriff Mark Wood and the Rapides Parish Sheriff's Office, Deputy Johnson's, Deputy Jane Doe's, and Deputy John Doe 1's unconstitutional behavior, as alleged above, was and is a custom of the Rapides Parish Sheriff's Office that it is perfectly acceptable, as evidenced by Lt. Shannon's and Deputy John Doe 2's failure to intervene and stop Deputy Johnson, Deputy Jane Doe, and Deputy John Doe 1 from conducting the illegal search of Goldstein's and Larkai's U-Haul.

193.

By failing to recognize or correct the deficiencies with his policies, practices and customs, Sheriff Mark Wood consciously disregarded the known and foreseeable consequences thereof.

194.

Sheriff Mark Wood's and the Rapides Parish Sheriff's Office's deliberately indifferent policies, practices and customs were the moving force behind Goldstein's and Larkai's injuries and the deprivation of their constitutional rights.

195.

There is a direct causal link between the policies, practices and customs of Sheriff Mark Wood and the Rapides Parish Sheriff's Office and the injuries to and violation of Goldstein's and Larkai's constitutional rights.

196.

As a direct and proximate result of the foregoing policies, practices and customs of Sheriff Mark Wood and the Rapides Parish Sheriff's Office, the violations of the constitutional rights of Goldstein and Larkai by Deputy Johnson, Lt. Shannon, Deputy Jane Doe, Deputy John Doe 1, and Deputy John Doe 2 was substantially certain to occur.

197.

As a result of the actions and/or inactions of Sheriff Mark Wood and the Rapides Parish Sheriff's Office, Goldstein and Larkai have suffered damages including: (1) the loss of liberty and freedom; (2) mental and emotional injury; (3) physical injury, pain and suffering; (4) financial losses; and (5) any other special and general damages and expenses, in an amount to be proven at trial.

**Count V**
**Violation of 42 U.S.C. § 1983:**
**Denial of Reasonable Medical Care to a Pre-Trial Detainee and Deliberate Indifference to Goldstein's Constitutional Right to Receive Adequate Health Care**
**(Goldstein Against Nurse Jane Doe)**

198.

Goldstein repeats, reiterates and re-alleges every allegation contained in Paragraphs 1 through 165 of this Petition for Damages with the same force and effect as if fully set forth herein:

199.

As alleged above, Nurse Jane Doe, acting under color of law, violated Goldstein's constitutional right to receive adequate and appropriate health care as a detainee at the Rapides Parish Detention Center (Center 1) when Nurse Jane Doe ignored Goldstein's medical condition, health complaints, and repeated requests for medical attention, and just threw Goldstein back into the holding cell with no food, no water, and no medical attention.

200.

Nurse Jane Doe never questioned or inquired into Goldstein's medical emergency/condition and complaints, and never contacted or summoned any emergency medical services to further evaluate or render medical assistance to Goldstein during the time he was an inmate at the Rapides Parish Detention Center (Center 1).

201.

These actions and/or inactions of Nurse Jane Doe showed a deliberate indifference to Goldstein's medical emergency and serious medical needs for which she had knowledge of.

202.

As a result of the actions and/or inactions of Nurse Jane Doe, Goldstein has suffered damages including: (1) the loss of liberty and freedom; (2) mental and emotional injury; (3) physical injury, pain and suffering; (4) financial losses; and (5) any other special and general damages and expenses, in an amount to be proven at trial.

**Count VI**
**Violation of 42 U.S.C. § 1983: *Monell* Claims**
**Denial of Reasonable Medical Care to a Pre-Trial Detainee and Deliberate Indifference to Goldstein's Constitutional Right to Receive Adequate Health Care**

**(Goldstein Against Sheriff Mark Wood in His Official Capacity, Nortec, LLC, and the Rapides Parish Policy Jury)**

203.

Goldstein repeats, reiterates and re-alleges every allegation contained in Paragraphs 1 through 165 of this Petition for Damages with the same force and effect as if fully set forth herein:

204.

As alleged above, Nurse Jane Doe, acting under color of law, violated Goldstein's constitutional right to receive adequate and appropriate health care as a detainee at the Rapides Parish Detention Center (Center 1) when Nurse Jane Doe ignored Goldstein's medical condition, health complaints, and repeated requests for medical attention, and just threw Goldstein back into the holding cell with no food, no water, and no medical attention.

205.

Sheriff Mark Wood, the Rapides Parish Police Jury, and Nortec, LLC knew and were on notice that detainees and inmates of the Rapides Parish Detention Center were being denied adequate medical care and treatment, and that the requests for medical care and attention by detainees and inmates were being ignored by Nortec, LLC medical staff and the Rapides Parish Detention Center staff before and during the time of Goldstein's detainment at the Rapides Parish Detention Center.

206.

However, Sheriff Mark Wood, the Rapides Parish Police Jury, and Nortec, LLC did not and has not changed it policies and practices with respect to assessing, providing, and responding to the health concerns and requests for medical attention by detainees and inmates.

207.

At the time of Goldstein's detainment at Rapides Parish Detention Center (Center 1), Sheriff Mark Wood, the Rapides Parish Police Jury, and Nortec, LLC knew, or should have known, of continuing serious deficiencies in policies, practices and procedures at the jail related to assessing, providing, and responding to the health conditions and health care requests of detainees and inmates.

208.

Sheriff Mark Wood, the Rapides Parish Police Jury, and Nortec, LLC knew, or should have known, that the staff (including medical staff) at Rapides Parish Detention Center (Center 1) were inadequate or unwilling to protect or provide adequate treatment to a person with serious health condition and who requests medical attention, and that the staff that existed were inadequately trained or supervised with regard to assessing, providing, and responding to the health conditions, health complaints, and health care requests of detainees and inmates.

209.

Sheriff Mark Wood, the Rapides Parish Police Jury, and Nortec, LLC's failure to maintain the Rapides Parish Detention Center (Center 1) in accordance with "Basic Jail Guidelines" was in deliberate indifference to the medical needs of Goldstein.

210.

Nurse Jane Doe and the Rapides Parish Detention Center staff were inadequately trained to recognize when an individual, like Goldstein, may be suffering from a stroke or other serious medical condition that requires immediate medical attention or meaningfully participate in the individual's medical treatment and risk assessment.

211.

Sheriff Mark Wood and Nortec, LLC failed to train the Rapides Parish Detention Center staff on how to recognize serious health conditions and on how to adequately assess and respond to the health conditions and health complaints by detainees such as Goldstein.

212.

An adequately trained and supervised jail staff (and medical staff) would have recognized that Goldstein was suffering from serious health condition that required immediate medical attention and would not have flat out ignored Goldstein's numerous health complaints and requests for medical attention.

213.

As alleged herein, there are a series of unresolved, systemic deficiencies that show the existence of a *de facto* policy of the Nortec, LLC medical staff and the Rapides Parish Detention Center staff failing to adequately assess, treat, and respond to the health conditions, health complaints, and requests for medical attention by inmates and detainees of the Rapides Parish Detention Centers.

214.

As the result of *de facto* policies and practices permitted by Sheriff Mark Wood and Nortec, LLC to ignore detainees' serious medical conditions and requests for medical attention, Nurse Jane Doe, the Nortec, LLC medical staff, and the Rapides Parish Detention Center staff did not provide Goldstein sufficient access to reasonable medical care, but instead, ignored his repeated requests for medical attention and ignored objective evidence (*i.e.*, Goldstein's extremely high blood pressure rate) that Goldstein was in fact suffering from a serious medical condition that required immediate medical treatment.

215.

Nortec, LLC failed to adequately staff and train its employees, such as Nurse Jane Doe, responsible for providing constitutionally adequate medical health care to detainees and inmates at the Rapides Parish Detention Center.

216.

As a result of *de facto* policies and practices permitted by Sheriff Mark Wood, Rapides Parish Police Jury, and Nortec, LLC, the Rapides Parish Detention Center staff and Nortec, LLC medical staff is not trained and/or supervised to address the health care needs of detainees and inmates and, as a consequence, choose to ignore detainees' and inmates' serious health conditions and requests for medical attention, resulting in deliberate indifference to detainees' and inmates' health care needs.

217.

The actions and inactions of Sheriff Mark Wood, Rapides Parish Police Jury, and Nortec, LLC were reckless, willful, wanton, and malicious, and constituted deliberate indifference to the rights of Goldstein and were the proximate cause of Goldstein's injuries and damages.

218.

As a result of the actions and/or inactions of Sheriff Mark Wood, Rapides Parish Police Jury, and Nortec, LLC, Goldstein has suffered damages including: (1) the loss of liberty and freedom; (2) mental and emotional injury; (3) physical injury, pain and suffering; (4) financial losses; and (5) any other special and general damages and expenses, in an amount to be proven at trial.

**Count VII**
**Louisiana State Law Tort Claim for Denial of Medical Care/Attention**
**(Goldstein Against Nurse Jane Doe)**

219.

Goldstein repeats, reiterates and re-alleges every allegation contained in Paragraphs 1 through 165 of this Petition for Damages with the same force and effect as if fully set forth herein:

220.

As alleged above, Nurse Jane Doe failed to provide Goldstein with adequate and appropriate health care as a detainee at the Rapides Parish Detention Center (Center 1) when Nurse Jane Doe ignored Goldstein's medical condition, health complaints, and repeated requests for medical attention, and just threw Goldstein back into the holding cell with no food, no water, and no medical attention.

221.

The Louisiana state law negligence action for denial of medical attention requires an objective standard. Based on the allegations set forth above and alleged herein, a reasonable person in Nurse Jane Doe's position on July 7, 2022 would have certainly recognized that Goldstein was suffering from a medical emergency, evidenced by his blood pressure reading, he complaints of feeling bad, dizzy, weak, light-headed, and his repeated requests for medical attention were obvious signs of an objectively serious medical condition that required Nurse Jane Doe to provide Goldstein with prompt medical attention, or see that prompt medical attention was provided.

222.

However, as alleged above, Nurse Jane Doe failed entirely to provide Goldstein with prompt medical attention or see that prompt medical attention was provided to Goldstein, in violation of Louisiana law, and which was in breach of Nurse Jane Doe's duty under Louisiana law to provide Goldstein with reasonable medical attention as a pre-trial detainee at the Rapides Parish Detention Center. Nurse Jane Doe is therefore liable to Goldstein under La. C.C. arts. 2315 and 2316.

223.

As a result of the actions and/or inactions of Nurse Jane Doe, Goldstein has suffered damages including: (1) the loss of liberty and freedom; (2) mental and emotional injury; (3) physical injury, pain and suffering; (4) financial losses; and (5) any other special and general damages and expenses, in an amount to be proven at trial.

### Count VIII
### Louisiana State Law Tort Claim for (1) Denial of Medical Care/Attention and (2) Intentional Infliction of Emotional Distress *via* Principles of *Respondeat Superior*/Vicarious Liability Pursuant to La. C.C. arts. 2320 and 2317
### (Goldstein Against Sheriff Mark Wood, in his Official Capacity, and Nortec, LLC)

224.

Goldstein repeats, reiterates and re-alleges every allegation contained in Paragraphs 1 through 165 of this Petition for Damages with the same force and effect as if fully set forth herein:

225.

As alleged above, Nurse Jane Doe, who was working in the course and scope of her employment for Nortec, LLC and Sheriff Mark Wood, failed to provide Goldstein with adequate and appropriate health care as a detainee at the Rapides Parish Detention Center (Center 1) when Nurse Jane Doe ignored Goldstein's medical condition, health complaints, and repeated requests for medical attention, and just threw Goldstein back into the holding cell with no food, no water, and no medical attention.

226.

Accordingly, Sheriff Mark Wood and Nortec, LLC is liable to Goldstein for the torts committed by Nurse Jane Doe under the theory of *Respondeat Superior*/Vicarious Liability pursuant to La. C.C. arts. 2320 and 2317.

### Count IX
### State Law Claims
### (Goldstein and Larkai Against Sheriff Mark Wood, Deputy Johnson, Lt. Shannon, Deputy Jane Doe, Deputy John Doe 1, and Deputy John Doe 2)

227.

Goldstein and Larkai allege that Sheriff Mark Wood, Deputy Johnson, Lt. Shannon, Deputy Jane Doe, Deputy John Doe 1, and Deputy John Doe 2 are responsible and liable to them for the damages and injuries they have suffered as a result of the Defendants' actions and/or inactions pursuant to Louisiana Code of Civil Procedure Article 2315, which provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it"; Article 2316, which provides that "[e]very person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill"; Article 2317, which provides that "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody"; and Article 2320, which provides that "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed…responsibility only attaches, when the masters or employers…might have prevented the act which caused the damage, and have not done it."

228.

The actions and/or inactions of Sheriff Mark Wood, Deputy Johnson, Lt. Shannon, Deputy Jane Doe, Deputy John Doe 1, and Deputy John Doe 2, under the law of the State of Louisiana, constitute the torts of:

a.    Negligent and Intentional Infliction of Emotional Distress;

b.    Negligent Hiring;

c.    Negligent Retention;

d.    Negligent Supervision;

229.

As a result of the actions and/or inactions of Sheriff Mark Wood, Deputy Johnson, Lt. Shannon, Deputy Jane Doe, Deputy John Doe 1, and Deputy John Doe 2, Goldstein and Larkai have suffered damages including: (1) the loss of liberty and freedom; (2) mental and emotional injury; (3) physical injury, pain and suffering; (4) financial losses; and (5) any other special and general damages and expenses, in an amount to be proven at trial.

## DAMAGES

230.

As a direct and proximate result of the Defendants' actions and inactions as alleged herein, Goldstein and Larkai have suffered and will continue to suffer the following non-exclusive damages:

(1)     Past, present, and future mental pain, anguish, and suffering;

(2)     Past, present, and future physical pain and suffering;

(3)     Past, present, and future loss of enjoyment of life;

(4)     Past, present, and future medical expenses;

(5)     Past, present, and future physical disability and impairment;

(6)     Past, present, and future loss of wages and future earning capacity;

(7)     Any other damages to be proven at the trial of this matter.

231.

Goldstein and Larkai request that this matter be tried by a jury on all issues.

**WHEREFORE,** Plaintiffs, Mark Goldstein and Lester Larkai, pray that Defendants Sheriff Mark Wood, Deputy Johnson, Lt. Shannon, Deputy Jane Doe, Deputy John Doe 1, and Deputy John Doe 2, the Rapides Parish Police Jury, Nurse Jane Doe, and Nortec, LLC be served with this Petition for Damages; that said Defendants be cited to appear and answer same; that a

jury trial be had on all issues; and after due proceedings be had, that judgment be entered in favor

of Plaintiffs and against all Defendants jointly, severally, and/or *in solido*, in a sum sufficient to

compensate Petitioner for the following:

(1)     Past, present, and future mental pain, anguish, and suffering;

(2)     Past, present, and future physical pain and suffering;

(3)     Past, present, and future loss of enjoyment of life;

(4)     Past, present, and future medical expenses;

(5)     Past, present, and future physical disability and impairment;

(6)     Past, present, and future loss of wages and future earning capacity;

(7)     All litigation expenses and costs allowable by law;

(8)     Reasonable attorney fees; and

(9)     All other forms of relief provided by law or equity together with legal interest from
the date of judicial demand until paid.

Respectfully submitted,

*/s/ Lance C. Unglesby*
Lance C. Unglesby (#29690)
Adrian M. Simm, Jr. (#36673)
**Unglesby & Crompton, LLC**
607 St. Charles Avenue, Suite 300
New Orleans, LA 70130
Telephone: (504) 345-1390
Fax: (504) 324-0835
Lance@ucjustice.com
Adrian@ucjustice.com

*Counsel for Plaintiffs*
