**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| MARK GOLDSTEIN, ET AL. | CIVIL ACTION NO. 23-0899 |
| VERSUS | JUDGE ALEXANDER C. VAN HOOK |
| MARK WOOD, ET AL. | MAGISTRATE JUDGE PEREZ-MONTES |

**MEMORANDUM RULING**

The plaintiffs, Mark Goldstein ("Goldstein") and Lester Larkai ("Larkai"), filed a civil action under 42 U.S.C. § 1983 against the Sheriff of Rapides Parish, Mark Wood ("Sheriff Wood"), and six of his deputies, Justin Johnson, Deborah Durand ("Durand"), Jerry Rollins, Jason Jenkins, Casey McKinnerney, and Tiffanie Cox, (collectively, "Defendants"). Sheriff Wood and the deputies, except for Deborah Durand, moved for partial summary judgment on Goldstein and Larkai's claims that arise from their arrests following a traffic stop. Record Document 78. For the following reasons, the motion for partial summary judgment, Record Document 78, is **GRANTED**.

Granting the motion for partial summary judgment results in the dismissal of counts one, two, three, four, and nine of the second amended complaint. In effect, all claims of Larkai are dismissed, and all claims against the deputies, other than Durand, are dismissed. Following this ruling, only counts five through eight survive. These four counts belong to Goldstein alone, arise from his alleged inadequate

medical treatment while detained at the Rapides Parish Detention Center ("Detention Center"), and apply to Sheriff Wood and Durand only.

**Background**

On July 7, 2022, Deputy Justin Johnson ("Deputy Johnson") was stationed in the median, patrolling Interstate 49 near Alexandria, Louisiana, when he saw a U-Haul truck driving in the left lane. Record Document 78-2 at 1-2. Deputy Johnson saw no vehicle or obstruction in the right lane, so he pulled behind the U-Haul truck to conduct a traffic stop. *Id.* at 2. Deputy Johnson drove a fully marked police vehicle and activated his lights and sirens, but the U-Haul truck did not stop. *Id.* Deputy Johnson pursued the U-Haul truck for about nine miles and six minutes before it finally stopped on a bridge. *Id.* Deputy Johnson's lights and sirens remained active throughout the pursuit. *Id.*

The driver of the truck, Larkai, exited the vehicle, and Deputy Johnson placed him in handcuffs for officer safety. Record Document 78-4 at 0:07:12, 0:08:01. When asked why he failed to stop, Larkai told Deputy Johnson that he never saw Deputy Johnson behind him. *Id.* at 0:07:45. The passenger of the truck, Goldstein, also exited the vehicle, and Deputy Johnson handcuffed Goldstein for officer safety. *Id.* at 0:08:10.

After he secured Goldstein and Larkai, Deputy Johnson asked Larkai for his driver's license, and Larkai said that it was in a bag in the front of the truck. Record Document 78-4 at 0:11:07. Goldstein then told Deputy Johnson that they were driving from Reno, Nevada to Orange Beach, Alabama to move furniture. *Id.* Goldstein and

Larkai both confirmed that the U-Haul truck had nothing but furniture and luggage. *Id.* at 0:11:07, 0:11:44.

Deputy Johnson asked Goldstein and Larkai if the U-Haul had anything illegal inside and both said no. *Id.* at 0:11:51. Then, importantly, the body camera recorded Goldstein as he told Deputy Johnson that "you can search if you want to." Record Document 78-4 at 11:56-58. For their part, Goldstein and Larkai dispute that Goldstein consented to the search. *See, e.g.*, Record Document 86 at 30. Regardless, Deputy Johnson told Goldstein and Larkai that they were detained while he retrieved their identifications, and once again, they agreed with Deputy Johnson that this plan "sounded good." Record Document 78-4 at 12:05.

Deputy Johnson then searched the U-Haul truck for Goldstein and Larkai's identifications. Record Document 78-4 at 0:12:34. He found one wallet in a bag on the passenger side, *id.*, and then opened a second bag on the driver's side, *id.* at 0:13:30, where he found a second wallet. As Deputy Johnson opened the second bag, part of a smaller, clear bag was visible. *Id.* at 0:13:30. That small, clear bag held unidentified white pills. *Id.* Deputy Johnson did not stop to examine the clear bag and pills. *Id.* Also, around this time, the other deputies, Jerry Rollins ("Rollins"), Casey McKinnerney ("McKinnerney"), Tiffanie Cox ("Cox"), and Jason Jenkins ("Jenkins"), arrived at the traffic stop. *See* Record Document 78-4 at 0:14:17.

After gathering Larkai and Goldstein's licenses, Deputy Johnson checked for outstanding warrants, found none, and asked for consent to search again. Deputy Johnson asked Larkai and Goldstein: "I'm going to get them to search the vehicle if

that's good I'm gonna get y'all some tickets and then we'll be out of here, alright?" Record Document 78-4 at 0:20:16-22. Goldstein replied either "okay" or "K." *Id.* at 0:20:22-24.

Before searching the U-Haul truck, even though he already had consent, Deputy Johnson elected to conduct a canine sniff. Record Document 78-4 at 0:21:30. According to Deputy Johnson, his canine partner, Beny, gave a positive alert during the sniff. *Id.* at 0:21:30. Goldstein and Larkai dispute that Beny alerted, however. *See, e.g.*, Record Document 86 at 21.

After the sniff, Deputy Johnson asked Cox to place Larkai in her unit during the search, which she did. Record Document 78-4 at 0:24:30. Meanwhile, Deputy Johnson and the others began their search of the U-Haul truck. *Id.* at 0:26:02. They recovered from the U-Haul's cab the small, clear plastic bag of unidentified white pills found earlier, and the deputies also found marijuana gummies in the U-Haul's rear. *Id.* at 0:35:15. Goldstein admitted he had the gummies. *Id.* at 0:27:37. Although Goldstein claimed that he held a medical prescription for the gummies, he ultimately admitted that he did not have the medical card with him. *Id.* at 0:35:15. The U-Haul truck was then taken to a secure location for a further search and inventory, while Goldstein and Larkai were arrested.

Goldstein was arrested for and charged with possession of a controlled dangerous substance classified in Schedule I in violation of Louisiana Revised Statute § 40:966(C)(2)(A). Record Document 31 at 29-30. Larkai was arrested for a violation of three different statutes: possession of a controlled dangerous substance classified

in Schedule III in violation of Louisiana Revised Statute § 40:968(C), flight from an officer in violation of Louisiana Revised Statute § 14:108.1, and improper driving in the left lane in violation of Louisiana Revised Statute § 32:71. *Id.* at 30.

After his arrest, Goldstein was detained at the Detention Center. Record Document 31 at 39. Goldstein alleged in his second amended complaint that, during booking, he felt unwell and received a medical evaluation from Durand. *Id.* Goldstein, in his telling, informed Durand that he felt weak, faint, and hypoglycemic and that he needed water and food. *Id.* at 40. Goldstein was then strip searched, and according to him, never received proper medical treatment despite continuing to tell other deputies that he needed help. *Id.* at 40-42. After he was released later that same day, Goldstein alleged that he collapsed at his hotel and was taken to the hospital for treatment. *Id.* at 43. Goldstein asserted that he suffered Hypokalemia, an acute kidney injury, and a left and right acute ischemic stroke because of the inadequate medical treatment he received at the Detention Center. *Id.*

After two amendments, Larkai and Goldstein asserted nine causes of action in their complaint against Sheriff Wood and the deputies. *See generally* Record Document 31. Counts one through four and nine are brought by both plaintiffs against varying defendants and arise from the traffic stop and arrest. *Id.* at 60-69, 77. Counts five through eight are brought only by Goldstein against either or both Sheriff Wood and Durand, and they arise from his alleged inadequate medical treatment while at the Detention Center. *Id.* at 69-80. Sheriff Wood and the deputies named in counts one through four and nine moved for partial summary judgment,

seeking to dismiss these claims. Record Document 78. The Court addresses each of these counts in turn.

**Standard**

Federal Rule of Civil Procedure 56(a) requires a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When the burden at trial will rest on the nonmovant, the movant need not produce evidence to negate the elements of the nonmovant's case; rather, it need only point out the absence of supporting evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the movant satisfies its initial burden, the nonmovant must demonstrate a genuine dispute exists by "going beyond the pleadings" and "designating specific facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). This burden requires more than metaphysical doubt, conclusory or unsubstantiated allegations, or a mere scintilla of evidence. *Id.*

**Analysis**

Goldstein and Larkai asserted federal claims against Defendants under 42 U.S.C. § 1983. *See generally* Record Document 31. Section 1983 provides a federal cause of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" against any person acting under color of state law. *See* 42 U.S.C. § 1983. Section 1983 does not itself create substantive rights; rather, it merely provides remedies for the violation of rights guaranteed to citizens by the

United States Constitution or other federal laws. *See Graham v. Connor*, 490 U.S. 386, 393-94 (1989).

Defendants answered their federal claims and asserted qualified immunity. *See, e.g.*, Record Document 52 at 49. Qualified immunity shields government officials from liability for claims against them in their individual capacity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity applies regardless of whether the official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Because qualified immunity is "an immunity from suit rather than a mere defense to liability, ... it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Consequently, qualified immunity questions should be resolved at the earliest possible stage in litigation. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). While qualified immunity is technically an affirmative defense, once it has been raised, it is the plaintiff's burden to negate the defense. *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012).

In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Supreme Court held that a court ruling upon the issue of qualified immunity must apply a two-step analysis. First, the court must determine whether the facts alleged show the officer's conduct violated a constitutional right. *Id.* Second, if a violation has been established, the court must determine whether the officer's actions were objectively reasonable in

light of clearly established law at the time of the conduct in question. *Id.* Lower courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. A Section 1983 complaint must allege that the constitutional or statutory deprivation was intentional or due to deliberate indifference and not the result of mere negligence. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

## I. Count One

Goldstein and Larkai alleged that Defendants violated their Fourth Amendment rights to be free from unreasonable search and seizure. Record Document 31 at 60. In their complaint, they pleaded that Defendants violated this constitutional right by "stopping, seizing, and searching Goldstein and Larkai for a prolonged period of time, and by conducting an unreasonable and illegal search of their U-Haul and personal belongings[.]" *Id.* Each of these theories is addressed below.

### A. Traffic Stop

Although Goldstein and Larkai alleged in their complaint that the traffic stop violated their constitutional rights, they abandoned that claim at the summary judgment stage. Record Documents 31 at 60, 86 at 30. The United States Court of Appeals for the Fifth Circuit has held that "[a] plaintiff abandons claims when it fails to address the claims or oppose a motion challenging those claims." *Terry Black's Barbecue, L.L.C. v. State Auto. Mut. Ins. Co.*, 22 F.4th 450, 459 (5th Cir. 2022). Other

district courts have held the same when a plaintiff concedes their claim lacks merit. *See, e.g.*, *Johnson v. Univ. of Miss.*, No. 21-62, 2022 WL 17824958, at *2 (N.D. Miss. Dec. 20, 2022) ("Because [plaintiff] 'concedes to the dismissal of her race discrimination claim,' the Court deems this claim abandoned."). Here, Goldstein and Larkai "do not disagree that [Deputy] Johnson's initial stop of the U-Haul was lawful." Record Document 86 at 30. The Court finds, therefore, that Goldstein and Larkai abandoned their claim that the initial stop amounted to a constitutional violation of the Fourth Amendment.

**B. Search**

Goldstein and Larkai, in the alternative, alleged that Deputy Johnson and the other deputies violated the Fourth Amendment when they searched the U-Haul truck without a warrant and without probable cause. Record Document 31 at 60. "[W]arrantless searches are per se unreasonable, and therefore unconstitutional, unless they fall into one of the few specifically established and well-defined exceptions to the general rule." *United States v. Jenkins*, 46 F.3d 447, 451 (5th Cir. 1995).

Consent to search is one exception to the Fourth Amendment's warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Consent may be express or implied, *United States v. Jaras*, 86 F.3d 383 (5th Cir. 1996), but it also "must be free and voluntary." *United States v. Kelley*, 981 F.2d 1464, 1470 (5th Cir. 1993). The government has the burden to establish consent was voluntary. *Id.* Whether consent was voluntary depends on six factors: "(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the

extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found." *United States v. Jenkins*, 46 F.3d 447, 451 (5th Cir. 1995).

In this case, Goldstein gave Deputy Johnson consent to search the U-Haul truck. Although Goldstein claimed that he did not consent, the recording from Deputy Johnson's body worn camera refutes that self-serving conclusion. *See, e.g.*, *Scott v. Harris*, 550 U.S. 372, 380 (2007) (finding that the officer's dash camera video recording so blatantly contradicted the plaintiff's version of events that no reasonable jury could believe plaintiff's claims). When Deputy Johnson asked Goldstein, soon after the stop began, whether he had anything illegal, Goldstein unequivocally said: "You can search if you want to." Record Document 78-4 at 0:11:56-58. Goldstein then consented to a search a second time. Deputy Johnson, before he began the search, asked Goldstein: "I'm going to get them to search the vehicle if that's good I'm gonna get y'all some tickets and then we'll be out of here, alright?" *Id.* at 0:20:16-22. Goldstein replied either "okay" or "K." *Id.* at 0:20:22-24.

For their part, Goldstein and Larkai claim that their consent was not voluntary because Deputy Johnson had Goldstein in handcuffs. Record Document 86 at 35. The Court is not persuaded. A consent to search does not become involuntary just because the plaintiff was handcuffed for officer safety. *See, e.g.*, *United States v. Franks*, No. 14-155, 2015 WL 2169768, at *4 (E.D. Tex. May 8, 2015) ("Although Defendant remained handcuffed for officer safety, Defendant's consent was voluntarily [given]

and the officers' search lasted only as long as he gave his consent."). The other circumstances of Goldstein's consent further underscore that he gave it voluntarily. Deputy Johnson's questioning that led to the consent had been routine, Goldstein quickly volunteered his consent (and more than once), and Goldstein had not been surrounded by deputies or otherwise pressured to offer his consent. Goldstein himself, who holds a master's degree from a prestigious university, admitted that he gave the consent because he "was trying to be as cooperative as possible." Record Document 86-4 at 8, 33. Accordingly, the Court holds that Deputy Johnson, and the others, had consent to search the U-Haul truck, and therefore, did not violate Goldstein and Larkai's Fourth Amendment rights.

**C. Arrest**

Finally, Goldstein and Larkai alleged that Deputy Johnson and the others violated the Fourth Amendment because they were arrested without probable cause. Record Document 31 at 60. To prevail on a claim of unlawful arrest, the plaintiff must show that they were arrested without probable cause. *Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir. 2001). Probable cause exists when the facts within an officer's knowledge "are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). Qualified immunity shields an officer from liability "even if he reasonably but mistakenly concludes that probable cause is present." *Evett v. DETNTFF*, 330 F.3d 681, 688 (5th Cir. 2003). Because Deputy Johnson arrested Goldstein and Larkai

for different crimes, the Court analyzes the existence of probable cause for those arrests separately.

### 1. Probable Cause for Larkai

Larkai was arrested for the violation of three different Louisiana criminal statutes, and although only probable cause for one is needed, the Court finds that Deputy Johnson had probable cause for Larkai's arrest under all three statutes. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009) ("If there was probable cause for any of the charges made, then the arrest was supported by probable cause[.]") (cleaned up).

To start, Deputy Johnson had probable cause to arrest Larkai for improper driving in the left lane. Louisiana Revised Statute § 32:71(B)(1)(a) prohibits driving in the left lane except, among other things, "[w]hen overtaking and passing another vehicle… [or] [w]hen the right half of a roadway is closed to traffic." Deputy Johnson had probable cause that Larkai violated this statute because he observed Larkai driving in the left lane. And Deputy Johnson saw that Larkai had not been overtaking another vehicle or avoiding an obstruction in the right lane.

In response, Larkai argued that his arrest was not proper because it was his first offense. Record Document 86 at 28. To support that argument, Larkai quoted a different section of the same statute, § 32:71(B)(1)(d)(2), that provides the criminal penalties for "proceeding on a multilane highway at a speed slower than the posted speed limit." The criminal penalties Larkai relied upon apply only to the violation of driving below the speed limit while in the left lane. La. Rev. Stat. § 32:71(B)(1)(d)(2)

("Persons in violation of *this Paragraph* shall be punished as follows.") (emphasis added). Accordingly, Larkai's argument that the improper driving statute did not permit his arrest does not have merit.

In the alternative, Deputy Johnson had probable cause to arrest Larkai for flight from an officer. Louisiana Revised Statute § 14:108.1 makes it unlawful to "intentionally refuse to bring a vehicle…to a stop knowing that he has been given a visual and audible signal to stop by a police officer[.]" The Court finds, without hesitation, that Deputy Johnson had probable cause for a violation of flight from an officer. Deputy Johnson, drove a marked police unit, activated his lights and sirens, and pursued Larkai for about nine miles and for more than six minutes before Larkai stopped. As the dash camera footage revealed, Deputy Johnson remained in sight of Larkai's mirrors throughout the pursuit.

Larkai, for his part, argued that Deputy Johnson lacked probable cause because he made the self-serving claim on the roadside that he never saw Deputy Johnson's vehicle. Record Document 86 at 27. Larkai further argued that based on this statement Deputy Johnson should have known Larkai did not intentionally refuse to stop. *Id.* But the Fifth Circuit has already rejected Larkai's argument that a self-serving statement to the officer can defeat probable cause. *See, e.g.*, *Loftin v. City of Prentiss, Miss.*, 33 F.4th 774, 780-81 (5th Cir. 2022) ("And a soon-to-be arrestee's naked assertion of [innocence] under these circumstances does not vitiate probable cause."); *see also Deville*, 567 F.3d at 165 ("[E]vidence that the arrestee was innocent of the crime is not necessarily dispositive of whether the officer had probable

cause to conduct the arrest because probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."). Therefore, regardless of Larkai's self-proclaimed innocence, Deputy Johnson had probable cause to arrest Larkai for flight after pursuing Larkai for nine miles and six minutes with lights and sirens active.

In the second alternative, Deputy Johnson also had probable cause to arrest Larkai for possession of a schedule III substance without a prescription in violation of Louisiana Revised Statute § 40:968(C). The Fifth Circuit has made clear that so long as "a reasonable officer could have concluded that there was probable cause upon the facts then available to him, qualified immunity will apply." *Brown v. Lyford*, 243 F.3d 185, 190 (5th Cir. 2001). To avoid summary judgment, Larkai argued extensively that Deputy Johnson lacked probable cause because observing unidentified pills is not enough. Record Document 86 at 26. But federal courts do not view facts in isolation. *Terrell v. Allgrunn*, 114 F.4th 428, 435 (5th Cir. 2024) ("We view the existence of probable cause according to the totality of the circumstances.").

Here, Deputy Johnson had probable cause of unlawful possession of a controlled substance based on the totality of the circumstances. Larkai was found in possession of unidentified pills, *and* before he pulled over, Larkai had fled from Deputy Johnson for over nine miles and six minutes. Deputy Johnson explained that, based on his experience and training, "people that take a long or extended period of time to pull over after a traffic stop has been initiated… could be storing, hiding, placing illegal substances, handguns… in the cab of the truck." Record Document 86-

2 at 100-101. Furthermore, Deputy Johnson believed that his canine partner, Beny, had alerted him to narcotics during a sniff. Based on the length of time to pull over, the canine alert, and that the pills themselves had been packaged suspiciously, Deputy Johnson had a reasonable belief they were a controlled substance. Record Document 78-5 at 8, 28. In conclusion, the Court finds that Deputy Johnson had probable cause to arrest Larkai for possession of a controlled substance.

**2. Probable Cause for Goldstein**

As for the other defendant, Goldstein, Deputy Johnson had probable cause to arrest him for unlawful possession of a Schedule I substance. La. Rev. Stat. § 40:966(C). Deputy Johnson located marijuana gummies during the search, and Goldstein himself admitted that he had them without a prescription. *See* Record Document 78-4 at 0:27:05-11; *see, e.g.*, *United States v. Nash*, 414 F. Supp. 1213, 1218 (S.D. Tex. 1976) ("Moreover, once [defendant] confessed, [officer] clearly had probable cause to arrest him.").

Goldstein argued that his confession did not provide probable cause for his arrest because it was tainted. Record Document 86 at 29. Goldstein claimed the confession was tainted because, at that time, he had been arrested and had not been given *Miranda* warnings. *Id.* at 29-30.

The Court finds that Goldstein's confession was not tainted because he was not in custody. The Supreme Court has explained that it is "reasonable for passengers to expect that a police officer at the scene of a crime, arrest, or investigation will not let people move around in ways that could jeopardize his safety." *Brendlin v. California*,

551 U.S. 249, 258 (2007). A traffic stop does not automatically put a person in custody. *United States v. Bengivenga*, 845 F.2d 593, 598 (5th Cir. 1988). At the time of his confession, Goldstein had been detained for officer safety, which was reasonable, because Deputy Johnson had just pursued the vehicle for a long time, confronted two occupants of the vehicle, and Deputy Johnson had been alone.

Moreover, Goldstein's argument that he should have received *Miranda* warnings is also unavailing because he was not subject to custodial interrogation. The right to *Miranda* warnings vests when "a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 292 (1980). "The roadside questioning of a motorist detained pursuant to a routine traffic stop does not constitute 'custodial interrogation' for the purposes of the *Miranda* rule." *Berkemer v. McCarty*, 468 U.S. 420, 421 (1984). Here, Goldstein was not subjected to a custodial interrogation when he admitted to having marijuana gummies. Deputy Johnson asked Goldstein routine questions about his travel, what they were transporting, and whether the U-Haul truck contained anything illegal. Without more, Goldstein had no right to *Miranda* warnings, and his confession was not tainted. Because Goldstein's confession gave Deputy Johnson probable cause for arrest, the Court finds that there was no Fourth Amendment violation.

## II. Count Four

In this count of their second amended complaint, Goldstein and Larkai asserted *Monell* claims against Sheriff Wood in his individual and official capacity arising from his deputies' alleged Fourth Amendment violations. Record Document

31 at 63. Under Section 1983, municipal liability requires proof of three elements: (1) a policymaker, (2) an official policy, and (3) a violation of constitutional rights whose moving force is the policy or custom. *See, e.g.*, *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). Importantly, without an underlying constitutional violation, there can be no municipal liability under *Monell*. *See Albert v. City of Petal*, 819 F. App'x 200, 203 (5th Cir. 2020) ("[B]ecause there was no constitutional violation…there can be no *Monell*…claims."). Here, Sheriff Wood has no *Monell* liability because, as explained above, Deputy Johnson and the other deputies did not violate Goldstein and Larkai's Fourth Amendment rights.

**III. Count Nine**

In the final count of their complaint, Goldstein and Larkai asserted Louisiana state law tort claims against Sheriff Wood and Deputies Johnson, Rollins, Jenkins, McKinnerney, and Cox. Record Document 31 at 77. They asserted, in effect, two theories of tort liability: (1) negligent and intentional infliction of emotional distress, and (2) negligent supervision, retention, and hiring. *Id.* at 78. The tort claims for infliction of emotional distress arise from the stop, search, and arrests. *See* Record Document 86 at 40. The claims for negligent supervision, retention, and hiring arise from Sheriff Wood's handling of his canine deputies. *See id.* Neither theory of liability has merit.

To show an intentional infliction of emotional distress, the plaintiff must demonstrate that, among other things, the defendant's conduct "was extreme and

outrageous." *McCoy v. City of Shreveport*, 492 F.3d 551, 563 (5th Cir. 2007). Negligent infliction of emotional distress requires, at the least, that the defendant breached a duty owed to the plaintiff. *Pellerin v. Lafayette Consol. Gov't*, No. 20-1380, 2023 WL 8814664, at *10 (W.D. La. Dec. 20, 2023). Here, Goldstein and Larkai can show neither. To support these theories, Goldstein and Larkai relied entirely on the existence of a constitutional violation. *See, e.g.*, Record Document 86 at 40 ("[T]hey suffered severe emotional distress arising out of the Defendants' intentional violations of Plaintiffs' constitutional rights."). As the Court explained already, Deputies Johnson, Rollins, Jenkins, McKinnerney, and Cox did not violate the constitutional rights of Goldstein and Larkai. Therefore, Goldstein and Larkai's state law tort claims, which depend on an underlying violation, fail.

Goldstein and Larkai's negligent hiring, retention, and supervision claims against Sheriff Wood fare no better. Louisiana provides political subdivisions, and their employees (including Sheriffs), with immunity for "the exercise or performance…[of] their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties. La. Rev. Stat. § 9:2798.1(A)-(B). Called discretionary immunity, the party who raises this affirmative defense has the burden to establish it applies. *Solomon v. Lafayette Consol. Gov't*, No. 24-643, 2025 WL 3496923 at *9 (W.D. La. Dec. 5, 2025).

To determine whether discretionary immunity applies, Louisiana courts use a two-step test. *Roberts v. City of Shreveport*, 397 F.3d 287, 296 (5th Cir. 2005). First, the court determines "whether a state law, regulation, or policy specifically prescribes

the officer's course of action." *Id.* Second, if the decision is discretionary, the court then determines "whether the challenged action is grounded in political, economic, or social policy." *Id.*

Goldstein and Larkai's claims fail because a "sheriff's decision to hire, train, supervise, and retain officers are part of his discretionary power[,]" and "are not prescribed by law or regulation, and these duties are grounded in policy considerations." *Farmer v. Bailey*, No. 19-1384, 2024 WL 2978785, at *10 (W.D. La. June 13, 2024); *Skinner v. Ard*, 519 F. Supp. 3d 301, 321 (M.D. La. 2021); *see, e.g.*, *Curran v. Aleshire*, 67 F. Supp. 3d 741, 763-64 (E.D. La. 2014) (holding that "Sheriff Strain's decisions to hire, train, supervise and retain officers are part of his discretionary power within the course and scope of his lawful power and duties as sheriff [, and] [n]o statute or regulation has been presented which otherwise proscribe the application of these powers in this context.").

Although Goldstein and Larkai claimed that Sheriff Wood implemented his decisions in a negligent fashion, and thus does not benefit from discretionary immunity, they fail to show a genuine dispute. Record Document 86 at 40. Their complaints about Sheriff Wood's conduct relate to the alleged deficiencies of the policies themselves, rather than their implementation. *See, e.g.*, *id.* at 37 ("[T]he policies of the Rapides Parish Sheriff's Office regulating the selection, training, and documentation of police K9s are deficient."). As such, the Court holds that Sheriff Wood is entitled to discretionary immunity for Goldstein and Larkai's claims of negligent hiring, supervision, and training.

## IV. Abandoned Claims

Sheriff Wood and Deputies Johnson, Rollins, Jenkins, McKinnerney, and Cox also moved for summary judgment on counts two and three of the second amended complaint. Record Document 78-1 at 25-26. These counts relate to an alleged violation of the Equal Protection Clause and an alleged failure to intervene. Record Document 31 at 60-63. Goldstein and Larkai failed to defend these claims against summary judgment, and therefore, they are abandoned. *See, e.g.*, *ZL & Sky LLC v. City of Joshua, Tex.*, No. 22-182, 2024 WL 130754, at *3 (N.D. Tex. Jan. 10, 2024) ("When a plaintiff fails to defend or pursue a claim in response to a motion to dismiss or summary judgment, the claim is deemed abandoned.").

## Conclusion

For the foregoing reasons, the Motion for Partial Summary Judgment, Record Document 78, is **GRANTED**. An order consistent with the terms of this memorandum ruling shall issue herewith.

**DONE AND SIGNED** at Shreveport, Louisiana, this 30th day of October, 2026.

ALEXANDER C. VAN HOOK
UNITED STATES DISTRICT JUDGE